D. H. STANTON and MARY STANTON, Appellants, v. R. E. JONES.—59 S. W. (2d) 648.

Division One, April 20, 1933.

*Shultz & Owen* for appellants.

*Culver & Phillip* for respondent.

HAYS, J.—This is an action brought by the parents of W. L. Stanton, Jr., to recover damages for his death resulting from an automobile accident at mid-afternoon of October 9, 1927. There was a verdict and judgment for defendant. This appeal, taken by plaintiffs, involves only the correctness of instructions Nos. 2 and 3 given by the trial court at the instance of defendant. Following formal allegations in the plaintiffs' amended petition defendant's causative negligence is alleged in these general terms: "That at a curve in said highway, the defendant's car collided with the car in which deceased was riding, thereby injuring deceased and causing his death. That defendant at all times *saw* that the deceased was in a position of peril, in time, by the exercise of the highest degree of care, to avoid said accident and negligently failed to do so. Plaintiffs state that by reason of said negligent acts, deceased was injured and his death was thereby caused." (All italics ours.)

The accident occurred on a Sunday afternoon on a rock highway leading from St. Joseph in a southerly direction to the town of Agency, at a point where there is a sharp curve known as Dysart's curve. Approaching that curve from the north is a stretch of road, straight until the curve is reached, and then the road curves sharply to the east. There is a slight downward grade. On the inside of the curve is a high bank that prevents a view of the roadway around the curve, or of cars on it until the cars are within a certain distance of each other. On the outside of the curve (i.e., to the west and south or southwest) are two guard rails, a short distance apart,—to accommodate an intersecting road—each about thirty feet in length and both located about two and one-half feet from the outer edge of the roadway, which is paved to a width of twenty-four feet. The space between the edge of the pavement and the guard rails is level earth. A Chevrolet car, one-seated, proceeding from Agency, entered the Dysart curve from the east. In it were seated Albert Stanton, aged fourteen, on the left; Harold Smedley, aged fifteen, on the right; Robert Clinton, aged fifteen, between them; and Ben Stanton, aged twelve, seated on Smedley's lap. Ray Clinton, aged twelve, and W. L. Stanton, Jr., aged ten, were standing on the left-hand running board. Albert Stanton was driving. The defendant, driving a Studebaker sedan, entered the curve on the north.

He was accompanied by his wife, his son, Raymond, and his son's niece, Miss Ida Wallace, the women occupying the back seat.

The testimony of Smedley, who held Ben Stanton in his lap and whose view was thereby obstructed, was negligible, except in that he corroborated his companions in their estimate of the speed of their car and in their traveling on the right side of the road. The others seated with him in the car testified in substance, that in coming from Agency they had proceeded at varying speed, sometimes as high as forty to forty-five miles an hour, and sometimes much less, but had slowed down before reaching Dysart curve, which they entered and on which they proceeded at a speed of fifteen, eighteen to twenty miles an hour, at all times while thereon keeping to the right of the middle line of the road and near the outside edge, and keeping a lookout straight ahead. One estimated their distance from the Jones car when he first saw it at six or eight feet, another at twenty-five feet, and another at six feet, all saying there was nothing to prevent their seeing the Jones car except the curve and the high bank alongside, which their car was hugging; and that the time was too short for stopping their car or diverting its course when the two cars were about to meet; that they did not at the moment observe what happened to the two boys who were on the running board; that the cars came together "awful quick," and they "felt a jar" at the impact.

When the cars had been stopped the two boys were discovered lying upon the roadbed. The Clinton boy, in a dying condition, was found in the middle of the road, his body lying diagonally across the median line, the head toward the northeast and the feet toward the southwest. The Stanton boy was dead, his body lying slightly northeast of Clinton, with the head toward the north and at a point opposite the north end of the southwest railing. At the place where the boys lay there was a blood spot in the center or slightly east of the center of the roadway and fragments of glass were scattered about. On the roadbed there were fresh-appearing skid marks astride the middle line of the road, ending some six or eight feet north of where Clinton's body lay and extending back north some thirty to forty feet or more to a point even with or north of the front end of the Chevrolet as it then rested on the roadside. These marks were said to have "started a little on the east side of the road and angled off to the west, just a little, of the center of the road, when they started east and angled off to the other side of the road."

It was shown that from a car entering the north end of the curve in the middle of the road a car approaching on the east side of the curve could be seen a distance of approximately 125 feet. The two cars came together in a partial side-swiping movement approximately at the center of the curve. In the impact no part of the front por-

tion of the Studebaker, back as far as the windshield and the front edge of the left front door, was injured. That door, instead of being scraped or scratched, was pushed in, saucer fashion, the center of the door having a large impress that sunk the door inward, the handle-bar was bent backward so that the door could not be opened, the windshield and all glass on the left side of the car was shattered. Two of the occupants of the car were cut by flying glass, one of them severely. The car came to a stop in twelve or fifteen feet from the blood spot described, with its right wheels on the dirt portion of the road and within a foot of and alongside the southwest railing. It appears inferentially that the windshield was struck by the head of one of the boys who were riding on the running board of the Chevrolet. The Chevrolet came to a stop some fifteen or twenty feet north of the blood spot, on the right side of the road and with the right front wheel slightly beyond the edge of the pavement. The left front fender was bent under and toward the engine, a hubcap missing, and the left running board "rubbed some."

The substance of the testimony given by the occupants of the Studebaker car is the following: Defendant, sixty-five years of age, was driving a new car at fifteen or twenty miles an hour, south on the west (his right) side of the highway. He saw the Chevrolet car approaching when it was approximately 125 to 150 feet distant, at a rapid rate of speed and with people hanging out from the side of the car. Quoting—"I was driving very closely to the right hand side and yet, realizing it was my duty to give all the room possible to an approaching car when it seemed to be coming fast. I gave all the room I possibly could, . . . and feeling within myself that this car would go by me and feeling on safe ground—they were far enough away when I saw them that I saw they had ample room to make the turn—and I set myself to watching my own car and moved over as far to the right hand side of the road as I could, and just kept on driving, and getting farther to the right to give them ample room. I didn't watch the boys. I didn't try to follow the movements of the other car. . . . With as much room as they had, . . . I felt they would go by me. I undertook and did get out as far out from that on as I could in safe driving for myself and family. I was within two feet of the guard rail when the impact came. When I first saw them coming they were out into the road as much as the center or more to the south—well into the road south of the center." He did not observe their closer approach or see the impact. Nor did he apply his brakes or slide his car at any time. The son, Raymond, testified that his father was driving slowly on account of his car being a new one; that in going into the curve he noticed the car coming from the east on account of its speed. It was beyond the center of the roadway and with somebody on the running board.

His father, already on the outside of the curve, pulled his car as far as he could toward the guard rail to give all room possible for passing, the right wheels being off the pavement and on the dirt portion between the paving and the railing. "I felt," he said, "that he was far enough that there was no danger of his hitting us, but it seemed to me they kept coming right straight toward us, and when they got within eight or ten feet of us it looked like they turned over more towards us and their car struck my father's car I think about the rear end of the left fender . . . and side-swiped our car." Mrs. Jones testified that she saw the car coming nearer and nearer from the east; that in coming around the curve the boys were over past the middle of the right side of the road. "When they got within a few feet of us the car turned in towards us: I suppose they lost control. I can't tell what happened when they struck; I shut my eyes when I seen they were going to strike. I couldn't tell what parts of the cars came together. In fact I thought they were going to pass us; they turned in towards us."

 The defendant's criticised Instruction No. 2, after hypothesizing preliminary matters, substantially told the jury that if they should further find from the evidence that, "when the two cars had approached within 100, 125 or 150 feet of each other, the defendant for the first time *saw* the Chevrolet approaching and saw that it was in, or coming into, or likely to come into the path of defendant's car, if such was the fact, and if the jury should further find that at the time and under the conditions just hypothesized (if they so found) defendant, in order to avoid a collision, immediately began to swerve his automobile to the right and drive the same to the extreme right edge of the pavement and as near the guard rail as he could drive the car with safety to its occupants, and that in so doing (if the jury should so find) defendant exercised *the care* that a very prudent person would have exercised under the same or similar circumstances to avoid a collision with said Chevrolet car, etc., then the jury should find for defendant.

The appellants take the position that this instruction omits other duties incumbent upon defendant in the situation, improperly singles out the one act therein specified and erroneously directs the jury that if defendant performed that act he performed his whole duty and should be exonerated. It is argued that there was a duty incumbent upon defendant "to immediately apply the brakes for a stop and immediately give more or *all* of the road, in order materially to increase the distance and opportunity of the boys' car to right itself." In support of their position the appellants cite Williams v. Fleming, 284 S. W. (Mo.) 796, 797; Rice v. Bridge Co., 216 S. W. (Mo.) 1. c. 751; Kennedy v. Phillips, 319 Mo. 573, 5 S. W. (2d) 1. c. 39, 40; Martin v. Fehse, 331 Mo. 861, 55 S. W. (2d) 440.

In the Williams-Fleming case the negligence charged in the petition was the failure to stop or slacken the speed of the car or sound a warning of its approach, after the defendant saw or in due care might have seen plaintiff's peril and obliviousness. The erroneous instruction in that case, so far as material here, said in substance, that if as soon as plaintiff left the curbing in question, "the motorman used reasonable care in an effort to stop the car," then it was the jury's duty to return a verdict for the defendants.

In Rice v. Bridge Co., 216 S. W. (Mo.) l. c. 751, the faulty instruction told the jury that in determining whether the motorman used ordinary care to take into consideration "the darkness of the night, the presence of weeds or grass, the speed of the car, the natural excitement under which an ordinary person would labor in coming suddenly upon a person in so great a peril," etc. It was held to be erroneous because it assumed the existence of a disputed fact and commented upon facts singled out.

Kennedy v. Phillips, 319 Mo. 573, 5 S. W. (2d) l. c. 40, was a freight elevator case. The jury were improperly instructed that if the elevator was in the exclusive use and control of the defendant and not supposed to be operated by customers, and was found open, the jury might infer that it was opened by defendant's employees. This court held that the instruction was argumentative, and that it improperly singled out facts and commented upon their legal effect.

Comparing the instruction in the instant case, set out above, with the instructions in the cases just noted, we think the former is without any of the faults of the others, and is distinguishable in several respects. Clearly it does not, as in the instructions in the last two cases, group circumstances merely evidentiary and undertake to direct the jury to draw an inference therefrom which would determine an ultimate fact in the case; and does not, as in the first of the two, assume the existence of a disputed fact. While, as already shown, both the pleadings and the facts in the Williams-Fleming case, supra, specifically raise both a duty to stop and a related duty to warn, and the instruction there was supplemented by no other and was erroneously predicated upon the sole duty to stop, the situation is somewhat different in the instant case. Here the charge contained in the petition was in the most general terms, stating no particular causative action or non-action of defendant but only his negligent failure to avoid the accident by due care when he *at all times saw* the deceased was in a position of peril. Appellants' main instruction here precisely followed the allegations in the petition and consequently did not point to any particular action or non-action of the defendant as constituting failure to avoid. Yet, from the very generality of its terms it necessarily included any and all acts of omission or commission of the defendant which his duty to exercise

the highest care imposed upon him. If they were so included, and if appellants were not satisfied, they should themselves have offered instructions more specifically hypothesizing such duties. [Ward v. Fessler, 252 S. W. (Mo.) 667, l. c. 671; Browning v. Railroad, 124 Mo. 55, 27 S. W. 644; Powell v. Railroad, 255 Mo. 420, 454, 164 S. W. 628.]

The defendant rested his whole defense upon his acts as shown in the evidence given in his behalf and set out in his Instruction No. 2. This instruction referred to ultimate facts only and declared their legal effect, conditioned both on the jury's finding thereon and upon a further finding as to the sufficiency of the facts themselves to meet the test of due care under all the circumstances of the case. It fully recognized and in nowise invaded the jury's province and was within a well established rule pertaining to instructions. In Ward v. Fessler, 252 S. W. l. c. 671, it is said: ''The plaintiff is confused as to what is meant by comment upon the evidence. It is always proper for the court to tell the jury what is the legal effect of facts in proof. [Price v. Railroad, 185 Mo. App. 432, l. c. 439, 170 S. W. 925; Tyler v. Hall, 106 Mo. 313, l. c. 323, 17 S. W. 319.] It is not proper for the court, in an instruction, to give undue prominence to certain parts of the evidence upon which the jury must pass in finding the facts. That is a comment upon the evidence, but that is a very different thing from telling the jury what is the legal effect of certain facts in proof. The court was obliged to direct the jury's attention to the facts upon which the plaintiff relied to establish the defendant's negligence. This court said, in the case of State v. Pyscher, 179 Mo. l. c. 159, 77 S. W. 841: 'In the trial of a cause, the State or defendant may offer testimony upon any particular fact, and it is not a comment upon the testimony to especially refer to that fact; but it would be otherwise if the court should undertake to refer specially to items of evidence, as to its weight, etc., in support of the proof of the fact itself.' ''

█ The principal part of appellants' case consisted in developing that defendant, upon his first sight of the Chevrolet car set his brakes and skidded some sixty feet into a collision with it. Defendant's case, on the other hand, rebutted the braking and skidding and developed that upon observing and noting the position of the approaching car the defendant gave it no further attention but gave all his attention to turning his car to the right and thereafter driving the same ''to the right side of the road as far as the safety of the occupants would permit.'' Assuming there was an issue upon defendant's omissions, as contended, does it follow that defendant was, as argued, bound to hypothesize them in his instructions? We think he was not, and for reasons additional to the fact that such issue was included in plaintiffs' Instruction No. 1.

█ As defendant's instruction recited all the facts necessary for a defense and conditioned a verdict upon their being found from the evidence to be true, there was no need for him to set up a ground relied on by appellants for a recovery, since the finding of the matters mentioned in the former's instruction excludes the grounds relied on by appellants. [Chenoweth v. Sutherland, 129 Mo. App. 431, 107 S. W. 6; Lawbaugh v. Mining Co., 202 S. W. (Mo. App.) 617.] It did not, as contended by appellants, and as in the Fleming case, supra, make defendant's care referable alone to the mode of his performance of a stated act, or attempting to perform it, but referred to his whole course of conduct from the time he saw the other car until the collision occurred; which reference, with respect to his defense, comprehended all the elements of his negligence *vel non*, whether consisting in acts of omission or commission. Nor did the instruction exclude, as is argued, any of the attendant facts and circumstances as "the same or similar circumstances" were mentioned in stating the measure of his care. █ Moreover, it hypothesized in its fullest legal sense the care requisite, using the definite article "the" in its emphatic and relative significance: "the care that"—synonymous with "the same," "such as" "that which," " all that" —"a very prudent person would have exercised under the same or similar circumstances to avoid a collision."

█ To the further criticism of the instruction for the reason it ignored the deceased lad's peril we do not agree. Appellants cite in this connection the case of Martin v. Fehse et al., supra. Of the instruction there under consideration we said: "The driver's duty under the humanitarian rule began when he saw, or by the exercise of the highest degree of care could have seen, plaintiff walking toward the path of the car, apparently oblivious of its approach." That was the plaintiff's case there as pleaded and as supported by the evidence. The instruction held to be erroneous did not hypothesize it. Whereas here the petition, in effect, charged that the collision was caused by defendant's negligent failure to avoid the same "when he at all times *saw* the deceased was in a position of peril." The instruction for plaintiffs here was upon the same hypothesis. Defendant's Instruction No. 2 was upon the hypothesis that when the other car was seen by him for the first and only time, defendant proceeded in a certain manner. Defendant's evidence tended to support his hypothesis and further tended to show that the Chevrolet was then not in a position of probable peril and its driver not apparently oblivious, but had the means, time and opportunity to control and direct his car as he might see fit. The two cases have no point of likeness or analogy. On the present record we think defendant's Instruction No. 2 was not erroneous.

█ Defendant's Instruction No. 3 told the jury, in effect, that if

they found from the evidence that each car was approaching in the path of the other and that defendant was driving his car to his right of the center of the road and that witness Albert Stanton was driving his car partly on his left of the center of the road and that there was no obstruction or anything else to prevent both drivers from seeing that each car was in or near the path of the other (if the jury so found) and if they further found from the evidence there was nothing to prevent said Stanton from turning his car to his right side of the center of the road so as to prevent a collision between the two cars, then defendant had a right to presume that said Stanton would timely do so and if the jury found the facts so to be then defendant was under no obligation to stop, slacken speed, or turn aside until he saw, or by the exercise of the highest degree of care would have seen that said Stanton did not intend so to turn his car; and if the jury found that it was then too late for defendant to avoid the accident by the exercise of the highest degree of care that a very prudent person would have exercised under the same or similar circumstances, then plaintiffs could not recover.

The instruction is predicated solely upon the evidence given in behalf of defendant, to the effect that, when he first saw the approaching car at a distance of 125 or 150 feet and at the same time drove his own car to the right and continued so to do, he left sufficient room for the other car to pass safely on his left. The testimony shows that was the judgment of the defendant, his wife and son. The son continued from the first to observe the oncoming car until, when it had come within eight or ten feet, it suddenly swerved to its left and into the side of the Studebaker car. If that view of the situation was correct the Chevrolet car did not come into imminent peril of being struck until immediately at the time it so swerved, almost instantaneously.

Among the several points raised on the instruction are these: First, that the evidence did not warrant a presumption, because as a matter of law under the evidence the boys' car was at all times in a place of danger, as when it was first seen the two cars were 75 to 100 feet apart and the boys' car was coming "about as fast as it could;" second, that defendant did not rely on presumption but acted immediately when he first saw the approaching car and was aware of its danger; third, the defendant could not presume the car would turn "until he saw" to the contrary, because he gave it no further attention; and fourth, that the rule is that defendant could indulge such presumption unless all the facts and circumstances should have notified him to the contrary. We are cited to Clark v. Railway, 319 Mo. l. c. 879, 880, 6 S. W. (2d) 954; Finn v. Railway (Mo. App.), 267 S. W. l. c. 420, 421; Goodwin v. Eugas, 290 Mo. l. c. 680, 236 S. W. 50; Zumwalt v. Railway, 266 S. W. (Mo.) l. c. 726; Barr v.

City of Kansas, 105 Mo. l. c. 559, 16 S. W. 483. Much of the foregoing discussion meets a considerable portion of appellants' argument made in this connection.

The instruction reviewed in Finn v. Railway, supra, had no features in common with the one now in hand, was an argumentative comment and had other vices. That in Goodwin v. Eugas, supra, was held to be without supporting evidence. The instruction in Zumwalt v. Railway, supra, was ruled upon its leaving out direct and circumstantial evidence that the fireman realized plaintiff was not going to stop in a place of safety, and that the collision was inevitable, when he first saw plaintiff on the right-of-way. The evidence here for defendant was the direct opposite. In Barr v. City of Kansas, supra, the instruction held to be faulty told the jury the plaintiff "had the right in crossing the street to assume that the same was in safe condition, unless she knew, or had reason to suppose that it was unsafe; and, if she did not know or had no reason to suppose that the street was unsafe by reason of the hole in question, then the jury cannot find her guilty of contributory negligence alone from the fact that she was running when she fell into the hole, or that her attention was attracted to some other object, so that she did not notice where she was stepping." It was held to be erroneous as "leaving in the background and out of sight all other facts in the case by which those facts might have been qualified and characterized as prudent or imprudent under the actual circumstances of the case, and was calculated to mislead the jury." That instruction is not at all comparable to the one in question, which refers to the situation involved and all the circumstances of the case, and without what may rightly be deemed comment.

Appellants' first question raised was one of disputed fact, not a question of law, and properly submissible to the jury. If the second contention is tenable, that defendant did not rely on presumption because the deceased was, and apparently would remain, in a place of danger when the defendant first saw the approaching car and began to turn his own car to the right, the instruction worked no prejudice. But the evidence for defendant shows that defendant did *not* believe the car was then in imminent danger but that it would turn aside in safety. As to the third contention of error, in that defendant could not presume the car would turn "until he saw" to the contrary, because defendant gave it no further attention, we think the point is not tenable. It is true that the right, as such, to presume did not continue after he saw the car did not turn aside, if he did see; but there was no evidence of his subsequently seeing. That situation was essentially covered by Instruction No. 2, and in that case No. 3 would be rendered useless, but not prejudicial. Besides, the right to presume was, in express terms, permitted to continue only "until he

644

saw or should have seen" the driver did not intend to turn aside. Defendant's proof was to the effect that there was no imminent peril until the cars came within eight or ten feet of each other and the Chevrolet swerved to the left and against defendant's car; that otherwise there was room to pass in safety. It was not a question of safe place in the usual sense of that term, as the argument seems to run. The term signifies fixation. Rather the question was a likelihood of danger arising and progressively increasing from the cars approaching each other in partially the same line of travel. The foregoing contentions are disallowed. Speaking to the fourth contention, we think the instruction embraced by reference thereto the facts and circumstances bearing upon the matters hypothesized. With respect to presumption, as it arises upon this record, we think the applicable rule is that which was, in the case of Clark v. Railway, supra, 1. c. 879, stated as follows: "If Clark saw the train coming, or knew that it was coming, he was not in a position of imminent peril. Although a person may be in the pathway of approaching danger, yet, if he is fully cognizant of it and has the present ability to easily avoid it, he is not in a position of imminent peril within the rule. The presumption is that under such circumstances he will avoid the danger. Consequently, if the engineer of a train sees an adult person approaching the track, unless there is something in his actions or manner to indicate the contrary, the engineer has the right to assume that such person will stop before going on the track; or if on the track, that he will step off into a place of safety. This in substance has been ruled so often that we deem it unnecessary to cite cases."

We think that the instructions when read and considered together as a whole, as they should be, were not misleading and that they fairly put the case to the jury. The defendant strenuously insists that the case was not a submissible one. It has been tried three times, and once heard on appeal in the Kansas City Court of Appeals (19 S. W. (2d) 507). The defendant suggests that plaintiffs' case as presented at this trial showed weaknesses that did not appear in the previous trials. From the full statement and the exposition which we have made of the case we discover nothing that seems to detract from its submissibility.

For the reasons stated the judgment is affirmed. All concur.