WILLIAM LOTTA ET AL. v. KANSAS CITY PUBLIC SERVICE COMPANY, a Corporation, Appellant.—117 S. W. (2d) 296.

Division One, May 26, 1938.*

*NOTE: Opinion filed at September Term, 1937, January 4, 1938; motion for rehearing filed; motion overruled April 1, 1938; motion to transfer to Court en Banc filed; motion overruled at May Term, 1938, May 26, 1938.

744

*Charles L. Carr, Cooper, Neel, Kemp & Sutherland* and *E. E. Ball* for appellant.

*Hipsh & Sadler* and *Chas. N. Sadler* for respondents.

746

HYDE, C.—This is an action for damages for the wrongful death of plaintiffs' minor son, who was run over by a street car. Suit was

brought against both the street car company (Kansas City Public Service Company) and the owner (Christian Rasmussen) who was also the driver of the truck in which the boy was riding. The trial court submitted the case against the Public Service Company solely upon the humanitarian doctrine, refusing to give a requested primary negligence instruction. The jury returned a verdict against the Public Service Company for $10,000, but found in favor of defendant Rasmussen. The Public Service Company has appealed from the judgment entered against it.

Appellant contends that its demurrer to the evidence at the close of the case should have been sustained because there was no case under the humanitarian rule and because there was not sufficient evidence to sustain any of the charges against it based on primary negligence. These were failure to stop the street car before crossing the highway on which the truck was traveling; failure to keep proper watch for persons upon the highway; failure to give a warning; crossing the highway so close to the truck that the driver could not avoid a collision; increasing the speed of the street car after starting across the highway; and employing a man too old to properly operate the car. The scene of the accident was the intersection of appellant's private right of way (running east and west) with Holmes Road, which was a north and south county highway (outside of Kansas City) paved with concrete slab twenty-four feet wide. The street car was going west on a track almost level but slightly upgrade, and the truck was coming north which was down a rather steep hill to within 100 feet of the track. Near the crossing the truck swerved sharply to the left (west) off the pavement and on to a gravel station walk in front of a shelter house or station maintained by appellant on the south side of its track. As it came alongside the street car in front of this shelter house the door came open and plaintiffs' son was thrown out. He fell under the car at a point about thirty-six feet west of the slab and its rear wheels ran over him. The street car stopped with the rear end only five or six feet from the boy's body. On the west side of the road 285 feet south of the track, on which the street car was running, there was a driveway entering the grounds of the Ivanhoe Country Club. Most of the witnesses said the truck had just passed this entrance when they first saw it, and that the car was then entering onto the slab. The east side of the shelter house at appellant's regular stopping place or station was 31½' feet west of the west edge of the slab. The shelter house was 12½' feet wide, and there was a trolley pole in the station gravel walk 8½ feet west of the west side of the shelter house. The truck stopped with its bumper against this pole. The front end of the street car was beyond this pole when it stopped. On the south

748

side of the crossing there was a gravel road running somewhat down-grade to the east, along the south side of the track.

Plaintiffs' witness Cobb said that he was standing in the front vestibule of the street car; that the car was running about two or three miles per hour when it approached the slab; that just as the car started across the slab he looked up and saw the truck fifteen or twenty feet north of the Ivanhoe entrance; that the car increased speed in crossing the slab; that the truck was in the middle of the slab running about thirty miles per hour (he was not sure as to this estimate); that the truck started to turn west when it was about forty feet from the car; that the front end of the car was about thirty feet west of the slab when the truck began to turn; that he thought the truck struck ''about the middle of the street car;'' and that the boy was lying across the track in front of the shelter house (5 or 6 feet behind the rear end of the car) after the car stopped. Plaintiffs' witness Mrs. Repass said that she was sitting about 20 feet back of the front end of the street car (a little ahead of the middle); that the car slowed down before reaching the slab; that it then ''increased the speed some'' (she could give no estimate of speed of either car or truck); that she first saw the truck as the part of the car where she sat entered upon the pavement; that the truck was near the mail box opposite the Ivanhoe entrance; that the noise of the brakes attracted her attention to it; that it was ''kind of like to the middle of the pavement just weaving along'' back and forth; that when the truck turned west the front end of the street car was across the slab (at least 20 feet); that the door flew open just as the truck left the pavement; that the boy ''fell out when they swerved;'' that the truck ''wasn't quite even with me when that boy fell out;'' and that thereafter ''the truck door struck the window just in front of me.'' The testimony of another passenger and a prospective passenger, waiting for the car, was introduced by appellant. They substantially corroborated plaintiffs' witnesses as to approximate relative positions of the car and truck at the different times fixed before they were stopped side by side beyond the shelter house, and as to other facts above related. One of them said that the street car was well on its way across Holmes Street when the truck was 300 feet away; estimated the distance between the truck and the street car, when the truck turned off the slab, at eighty feet; and said that about thirty feet of the street car (44 feet long) was then across the west side of the slab. All witnesses agreed that the truck had slowed down before it turned off the slab.

The motorman, who was operating the street car, testified that fifty or sixty feet east of the slab he threw off his power; that before he reached the slab the car had slowed down to five or six miles per

hour; that fifteen or twenty-five feet from the slab there was an opening through which he could see beyond the Ivanhoe entrance (by actual measurement this point was said to be 288 feet); and that he looked, saw nothing, and "immediately fed up" increasing speed to "about ten miles an hour" in crossing the slab. He said that he could see to the top of the hill (a quarter of a mile) when he reached the slab; that when he first saw the truck it was about 300 feet away; that it was after the car entered, and was near the middle of the slab when he saw the truck about 300 feet away; that, at ten miles per hour, he could have stopped within fifteen to twenty-five feet; but that would have stopped the car (44 feet long) completely blocking the slab. (Plaintiff had evidence that the car running ten miles per hour could be stopped in about ten feet.) He said that he continued to look at the truck until it got within about 110 feet; and that he was then "pretty near across (the slab) with the front end." He once said "when the front end of my car was about the middle . . . of the slab . . . it (the truck) must have been 110 feet (away)." Later he said this was a mistake and stated that "the front end of my car must have been over the west end of the slab" (he finally said 15 feet over) when the truck was 110 feet away; that the last time he saw the truck, until the collision occurred, he was across the slab and it was 110 feet away from the track; that at that time he noticed "the car was weaving (along the middle of the slab), just looked like the car was out of control;" that, although he said at the coroner's inquest the speed of the truck was "about 50 miles per hour," he could not estimate its speed; but that he thought he "was in a very dangerous position" when it was 110 feet from the car. He said that he did not see the collision or hear any noise or commotion; that he stopped with the front end of his car twenty or twenty-five feet west of the west side of the station; that there was one man on the north side of the track "standing there waiting for this car;" that he ran by where he was standing to clear the slab; that he did not know there was a collision until he looked and saw the truck at the side of the vestibule on the station gravel walk; that the truck could have gone no farther because it was right up at the pole in this walk; and that the collision broke off the corner of an iron plate (quarter of an inch thick) over the journal box just back of the vestibule and also scratched a mark six feet long on the side of the street car.

Defendant Rasmussen testified that when he first saw the street car he was about 200 feet from it; that it was "coming up to the slab . . . right at the edge of the east side of the slab;" that the front end of the street car "was four or five feet east of the east side of the slab;" that "it was in motion at that time" but "wasn't running

fast;" that when he saw "the street car wasn't going to stop there" he "applied the foot brakes;" but that he could not tell what distance he was from the track when he applied them; and that he was not driving more than twenty-five to thirty miles per hour anywhere on the hill. He said that the brakes "just didn't take hold;" that "they grabbed and threw the truck from side to side;" that he "would release it and put it on again" but "couldn't make them hold;" that he did not try to use the hand brake; but that he "finally decided to swerve with the street car to avoid a collision." He said that he had "good hydraulic brakes;" that they had been tested within the last month; that he had noticed nothing wrong with their operation prior to that time; and that if they had been working in good condition "there would have been no danger of a collision at all." He said that he was about twenty-five feet from the track when he turned to the left, that "we (truck and street car) were about head and head together at that time;" that he "wasn't going very fast at that time . . . around 8 or 10 miles" per hour; that he "did avoid a heavy collision" and made "just a very slight contact;" that he "broke the headlight, the bumper was bent a little, and the right front fender was bent down over the tire;" that his truck struck the car "a little in front of the middle" not "up as far as the vestibule;" and that he was not injured at all. He also said that at the speed he was going he could have stopped in a great deal less than 200 feet if his brakes had been working in normal condition; that at 25 miles per hour he "could stop, if the brakes had worked, within ten feet or fifteen;" that he cramped the steering wheel all he could; that "there wasn't anything the matter with the steering gear of the truck;" and that he never noticed the gravel road running east on the south side of the track.

We have a case here in which neither operator, of two vehicles each approaching the other's path, was oblivious of the other's approach. One (the street car) reached and entered the prospective intersection of their paths when the other (the truck) was from 200 to 300 feet from it. In the absence of obliviousness, the position or danger zone of imminent peril of a person approaching the path of a moving vehicle reaches no farther beyond the direct path of such moving vehicle than the distance within which such approaching person is unable by his own efforts to stop short of it. [Lamoreux v. St. L.-S. F. Ry. Co., 337 Mo. 1028, 87 S. W. (2d) 640; Wallace v. St. J. Ry., L., H. & P. Co., 336 Mo. 282, 77 S. W. (2d) 1011; Elkin v. St. Louis Public Service Co., 335 Mo. 951, 74 S. W. (2d) 600; Cavey v. St. J. Ry., L., H. & P. Co., 331 Mo. 882, 55 S. W. (2d) 438; Stanton v. Jones, 332 Mo. 631, 59 S. W. (2d) 648; McGowan v. Wells, 324 Mo. 652, 24 S. W. (2d) 633; Sullivan v. A., T. & S. F. Ry. Co.,

317 Mo. 996, 297 S. W. 945; State ex rel. Wabash Railroad Co. v. Bland, 313 Mo. 246, 281 S. W. 690; Smithers v. Barker, 341 Mo. 1017, 111 S. W. (2d) 47.] The zone of peril in such a case is widened by the speed of approach because the greater the speed of approach the greater the distance it would take to stop short of the path of the moving vehicle. Nevertheless, it is always narrower than the danger zone of an oblivious person approaching at the same speed, at least except where inability to control exists and would become apparent at the same distance at which obliviousness might be observed. In Smith v. Kansas City Public Service Co., 328 Mo. 979, 43 S. W. (2d) 548, and Kloeckener v. St. Louis Public Service Co., 331 Mo. 396, 53 S. W. (2d) 1043, and many other similar cases relied upon by plaintiffs, there was evidence both of obliviousness and reasonable appearance thereof in time to act effectively.

Clearly, there can be no humanitarian negligence in this case. Warning is not in the case because the driver of the truck said he saw the car before it entered onto the slab, and when he was 200 feet from it. [Phillips v. St. L.-S. F. Ry. Co., 337 Mo. 1068, 87 S. W. (2d) 1035; Pentecost v. St. L. M. B. T. Ry. Co., 334 Mo. 572, 66 S. W. (2d) 533; State ex rel. Weddle v. Trimble, 331 Mo. 1, 52 S. W. (2d) 864.] (Plaintiffs' witness Mrs. Repass said the motorman rang the bell.) There never was a time (under the most favorable view of the evidence) when the motorman saw the truck (could have seen is immaterial because he did see) in a position of imminent peril in time to have thereafter avoided the injury to plaintiffs' son by slackening speed or stopping the car. This is true because the truck was not in a position of imminent peril under the humanitarian rule before the front end car was on the slab; that is "certain, immediate and impending peril," and not probability of danger or "mere possibility of an injury." [Kirkham v. Jenkins Music Co., 340 Mo. 911, 104 S. W. (2d) 234; Wallace v. St. J. Ry., L., H. & P. Co., 336 Mo. 282, 77 S. W. (2d) 1011; Ridge v. Jones, 335 Mo. 219, 71 S. W. (2d) 713; Huckelberry v. Mo. Pac. Railroad Co., 324 Mo. 1025, 26 S. W. (2d) 980; State ex rel. Vulgamott v. Trimble, 300 Mo. 92, 253 S. W. 1014; Ziegelmeier v. E. St. L. & S. Railroad Co., 330 Mo. 1013, 51 S. W. (2d) 1027.] (Plaintiffs' instruction in this case made it "approaching a position . . . where there was danger of a collision between said truck and said street car," which is too great an extension of the danger zone.) Taking the distances most favorable to plaintiffs' theory (which are closer than those fixed by plaintiffs' own witnesses) the truck was 200 feet from the track when the car was about to enter upon the slab and was increasing speed to do so (Rasmussen); and it was 110 feet from the track when the front end of the car had reached the center of the

slab (holding defendant's motorman to a statement he said was a mistake). When the truck was 200 feet away from the track it was not in a position of imminent peril under the humanitarian rule. Even if obliviousness could widen the danger zone that far (as plaintiffs suggest, citing Homan v. Missouri Pacific Railroad Co., 334 Mo. 61, 64 S. W. (2d) 617) there was no obliviousness to so widen it in this case because the truck driver saw the car entering the slab at that distance. There was no appearance of the truck being out of control at that distance because, according to his testimony, he had not then put on the brakes which caused the weaving. There was no reason to believe that a truck that far away could not be stopped or its speed slackened sufficiently to allow the car to clear the slab, even if the truck was going fifty miles per hour. (All witnesses said, at the trial, it was less but at the coroner's inquest appellant's motorman made that estimate of the speed of the truck when he first saw it.) The driver said if the brakes had operated normally he could have stopped it in much less than that space and even the driver did not then know that they would not operate normally. The only other evidence as to stopping a vehicle at that rate of speed was plaintiffs' evidence concerning stopping a street car and certainly it is reasonable to believe that an automobile can at least be stopped within the same distance as a street car. We, therefore, hold that there was no humanitarian case when the car, with increasing speed, began to cross the slab, because there was then no position of imminent peril upon which to base it.

Plaintiffs' argument concerning the truck being 110 feet from the track when the front end of the car reached the middle of the slab is as follows:

"When the street car was in the middle of the slab the rear end of the car was projecting 32 feet 7 inches back east of the slab; the truck was running five times as fast as the street car and the operator knew it was out of control, and the operator was bound to know that while this truck was running 110 feet to the track the car would only run 22 feet, which would leave 12 feet and seven inches of the car still projecting east of the east edge of the slab, hence he was bound to know he could not clear the slab before the truck reached it. . . . The car could have been stopped at least by the time the front end of it reached the west edge of the slab and the truck would have passed in front of it. The uncontradicted evidence shows that the point where the collision occurred and the boy was run over and killed was 36 feet west of the west side of the slab."

Thus plaintiffs' position is that the motorman should have stopped the car so that it would completely block the entire pavement and

force the truck to take to the open country. There are several reasons why this contention cannot be sustained. Obviously it would have been negligent to stop where the certain result would be to block the slab and force the approaching truck to leave the highway or strike the car. [Powell v. St. J. Ry., L., H. & P. Co., 336 Mo. 1016, 81 S. W. (2d) 957.] Surely the operator of the street car was not required by the humanitarian rule to do a clearly negligent thing. Certainly also a part of his duty thereunder was that he should not do something that would endanger his passengers. Even if he thought the car would not stop, he could not reasonably be expected to anticipate that it would make a left turn across the highway to run up the private right of way of the street car company instead of continuing on the pavement, going behind it, or making a right turn into the gravel road running parallel to the track to the east. We hold that, under these circumstances, using full power to get the car (blocking half the slab) off the highway, before the truck traveled the remaining 110 feet, cannot be humanitarian negligence even if the danger zone could be extended 110 feet from the track. However, plaintiffs' argument assumes that the truck was still traveling fifty miles per hour when it was 110 feet away. The facts are that, even if it was traveling at fifty miles per hour when it was 200 feet, the brakes did have some effect (they would not throw the car to one side otherwise), so that it was running slower than its speed at 200 feet away. Furthermore, plaintiffs erroneously assume that the motorman should have anticipated that the truck would continue to the track at the same speed. That was not what happened. Why should he have anticipated it? All the evidence was that there was a considerable slackening of speed in the last 110 feet. A space of 110 feet is sufficient to slacken speed effectively (at even 50 miles per hour), if it was not sufficient space in which to stop.

But in addition to all this, the physical facts show the real situation more clearly and definitely that any oral explanation made of them by the witnesses, all estimates of speed were indefinite and uncertain. Distances were perhaps more accurately fixed because made with reference to certain objects, but the physical facts make it plain that there could not be a humanitarian negligence case here. The truck never did get in front of the car but had to leave the highway and run up to the station walk to get alongside. It only did so after the car had passed over the highway and reached a point where its rear wheels must have been more than 30 feet beyond the slab (where the boy was run over) and where the car must have then been considerably slowed down because it only ran 5 or 6 feet farther. At that point, where the boy fell out, the front of the truck was behind the front wheels of the car. Usually a humani-

tarian negligence case must fail when the plaintiff or his vehicle comes to an intersection last and runs into the side of the other vehicle. Unless there are exceptional circumstances, such facts show that the plaintiff was not in a position of imminent peril soon enough for the duties under the humanitarian doctrine to commence to operate in time for effective action. [Mahl v. Terrell, 342 Mo. 15, 111 S. W. (2d) 160; Ziegelmeier v. East St. Louis & Suburban Railway Co., 330 Mo. 1013, 51 S. W. (2d) 1027; Cavey v. St. J. Ry., L., H. & P. Co., 331 Mo. 882, 55 S. W. (2d) 438; Roberts v. Consolidated Paving & Material Co., 335 Mo. 6, 70 S. W. (2d) 543 (where, as in this case, a car door came open before a collision and the passenger fell under the back wheel of the other vehicle); Borgstede v. Waldbauer, 337 Mo. 1205, 88 S. W. (2d) 373; Wallace v. St. J. Ry., L., H. & P. Co., 336 Mo. 282, 77 S. W. (2d) 1011.] Certainly a humanitarian case fails where, as here, the truck left the highway, made a right angle change of direction, ran along a private right of way for more than thirty-six feet, and was still behind the front vestibule of the street car when it stopped.

If there was substantial evidence to sustain any charges of primary negligence, we would remand the case for trial thereon. The primary negligence upon which plaintiffs sought a submission was (a combination of several charges made in the petition) that "the operator of said street car saw, or by the exercise of ordinary care could have seen the said truck in which said Alexander R. Lotta was riding, approaching said crosssing at such a rate of speed and under such conditions (if you find it was so approaching) and knew or by the exercise of ordinary care could have known that the driver of said automobile truck could not stop same before reaching said crossing . . . knew or by the exercise of ordinary care could have known there was imminent danger of a collision between said street car and said truck if he attempted to cross said Holmes Street or Holmes Road in front of said truck . . . in time . . . to have stopped same before reaching said crossing." If the truck was 200 feet away when the street car (then increasing speed) was only five or six feet from the edge of the highway (most favorable view to plaintiff), we do not see how we can rule that it would be negligence on the part of the motorman to continue across the highway even if the truck was then traveling at 50 miles per hour. If the truck was 200 feet away when the car was almost at the edge of the slab, as the truck driver said it was when he first saw the car, then it must have been considerably farther away when the motorman first saw it (or where the evidence shows he could have seen it) and began to increase speed to cross the highway. If he had stopped when he saw it 200 feet away he would have stopped with the car

blocking at least half of the pavement, which is not usually a safe thing to do. Moreover, he could not be charged with knowledge then that there was anything wrong with the brakes on the truck because the truck driver himself did not know it at that time. Actionable negligence must be based upon what can be reasonably anticipated at the time, not merely upon what thereafter occurs. [McCollum v. Winnwood Amusement Co., 332 Mo. 779, 59 S. W. (2d) 693; Williams v. Terminal Railroad Assn, 339 Mo. 594, 98 S. W. (2d) 651.] We hold that the evidence in this case fails to show any substantial basis for the charges of primary negligence, and that appellant's assignment of error on failure to direct a verdict in its favor at the close of all the evidence must be sustained.

The judgment is reversed. *Ferguson, C.,* absent; *Bradley, C.,* concurs.

PER CURIAM:—The foregoing opinion by HYDE, C., is adopted as the opinion of the court. All the judges concur, except *Douglas, J.,* absent.