Vernon K. Poague, Appellant, v. J. M. Kurn and John G. Lonsdale, Trustees of the St. Louis-San Francisco Railway Company, a Corporation.—140 S. W. (2d) 13.

Division One, May 7, 1940.*

*E. L. Moore* and *Sizer & Myres* for appellant.

*J. W. Jamison, J. Carrol Combs* and *Mann & Mann* for respond-
ents.

158

HYDE, C.—This is an action for $50,000.00 damages, for personal injuries sustained when plaintiff's automobile was struck by defendants' train. The jury found the issues for defendants. Plaintiff has appealed from the judgment for defendants.

Defendants have filed a motion to dismiss because of the omission, from plaintiff's abstract, of exhibits and the testimony of some of defendants' witnesses. Since it appears that there was an agreement for filing the original exhibits and that this has been done, with the permission of this court, by filing the original bill of exceptions (of which these exhibits are a part and which contains all the testimony), the motion is overruled. We do not approve of leaving out of plaintiff's abstract this testimony of respondents' witnesses, but since it is all here we prefer to decide the case on the merits.

The case was submitted solely on humanitarian negligence. Plaintiff alleged and sought to submit charges of primary negligence (violation of a city speed ordinance and failure to give statutory crossing signals) which the trial court refused because it held plaintiff to be guilty of contributory negligence as a matter of law. Plaintiff assigns these rulings as error. This requires a review of the evidence on this issue, considered most favorably to plaintiff.

The collision occurred in Neosho, about 9 A. M. on September 11, 1937, where Baxter street crosses defendants' tracks. This was an east and west street and defendants' tracks ran almost north and south. This street crossed four tracks. The westernmost track (plaintiff came from the west and was going east) was the passing track, and the next track east of it was the main line track. As shown both by testimony and pictures, just east of the main line track and on the north side of the roadway, there was an automatic crossing signal on a high pole. This signal consisted of an alarm bell and a wig-wag, which had the shape and appearance of a flag, with the words "look" and "listen" on it. The wig-wag would swing back and forth above the roadway. This signal was wired to begin working when a train approached within 3000 feet. Baxter street was a wide, smooth graveled street and its approach to the tracks from

the west was almost on the level with them. There were two switch tracks east of the crossing signal. There was a space of between 12 and 14 feet between the east rail of the passing track and the west rail of the main line track. About 800 feet (or 6 telegraph poles about 130 feet apart) south of Baxter street the tracks curved to the west, and just beyond this curve (about 1000 feet or 8 telegraph poles) there were electric block semaphore signals, which could be seen from the crossing. Trees cut off the view of the track farther south or west along the main line track. Defendants' main line track came downgrade into Neosho from the south and west for about three miles. The grade was gradual between Baxter street and the block signal, but was "pretty heavy" beyond. The Neosho station was about two blocks (six telegraph poles) north of the Baxter street crossing. Between Baxter street and the station the tracks curved considerably to the east.

The day of the collision was clear and the tracks were dry. Plaintiff's car was an open 1929 Model A Ford roadster. Plaintiff said that he stopped his car about 10 or 15 feet west of the west rail of the passing track which he thought at that time was the main line track. He saw a freight train on this track, about 150 feet north of the crossing, moving slowly south at about three miles per hour. The bell on the engine of the freight train was ringing and the engine was puffing and making considerable noise. Plaintiff said that he stopped for about 10 or 15 seconds, looked south and saw no train on the tracks coming from the south. He said that when he first drove up there and stopped, he looked at the wig-wag and that it was not working. He also said that he never heard the automatic alarm bell ringing. He further stated that as he started up he "looked at this wig-wag signal" and that it was not operating. He saw that he would have plenty of time to cross over in front of the freight train and put his car in low gear and continued over the tracks at a slow rate of speed, about three or four miles per hour. He continued to look north all of the time until he got over the track on which the freight train was approaching. He was looking to see if another train was approaching from the north on the track east of the freight train. He said that after he saw the track east of the freight train was clear he "glanced back at the wig-wag but wouldn't be positive whether it could have been working." After crossing in front of the freight train, when he could see that the next track was clear to the north, he looked to the south again and saw a passenger train coming from the south. At that time, the front wheels of plaintiff's car "were either on or going on" the west rail of the main line track. He speeded up to six or eight miles an hour attempting to get across the main line track, but his car was struck about when his rear wheels were coming over the east rail of the main line track.

Several of plaintiff's witnesses testified that they heard the passenger train whistle south of the block signals. One of plaintiff's witnesses (Wasson), who was nearest to the place of collision, said that the automatic alarm bell was ringing (plaintiff's brief admits it was ringing); that the wig-wag signal was swinging back and forth; that the ringing of the alarm bell was what drew his attention (he was loading his truck at the canning factory nearby); and that he thereafter heard a whistle to the south sometime before the passenger train came in sight. Another witness who was driving a truck a block beyond the next crossing to the south of Baxter street heard an alarm bell ringing at that crossing. Plaintiff's witnesses put the speed of the passenger train at from 40 to 50 miles per hour. However, the engineer of the passenger train who was put on the stand by plaintiff said it was about 25 to 30 miles per hour. He said that it was drifting downgrade, not working steam; that he had applied the brakes twice to slacken its speed after starting down the hill; that he was to stop at the Neosho station, which was a regular stop for his train; that he whistled one long, two shorts and a long whistle, when the fireman signaled they were approaching the block signals; and that the engine bell was ringing by automatic air all the way down the hill to Baxter street.

Plaintiff seeks to excuse his conduct by the presence of the freight train and the noise it was making. Plaintiff was in an open car with nothing to obstruct his view. He said he could see 800 feet south, from the point where he stopped, and his pictures indicate that he could see to the block signals. Plaintiff's witness Wasson said that the crossing alarm bell was ringing and the wig-wag swinging before the passenger train whistled south of the block signals. If the train traveled the whole distance at 50 miles per hour, it took it at least 40 seconds to travel the 3000 feet during which the bell would ring. Likewise it would take about 14 seconds for it to come from the block signals to Baxter street and almost 11 seconds to travel the last 800 feet. Plaintiff must have reached the main line track, from the point where he said he stopped, in about half that time. Yet plaintiff says he was stopped 10 or 15 feet from the tracks for 10 or 15 seconds before he started across, but never heard the bell (less than a third of the distance from him that the freight train was when he started across), never saw the wig-wag swinging (although he said he looked at it as he started up), and never heard the passenger train whistle, beyond the curve, although almost every witness on both sides did hear it. Then in the face of the ringing alarm bell and the swinging wig-wag, he drove on the tracks without looking south until his front wheels were on the track upon which the passenger train was approaching. Failure to see what was plainly visible (according to plaintiff's own witnesses) before his eyes, and to hear what others heard (or to heed it if he did), is conclusive evidence of plaintiff's

negligence. [See Scott v. Kurn, 343 Mo. 1210, 126 S. W. (2d) 185; State ex rel. Kansas' City Southern Ry. Co. v. Shain, 340 Mo. 1195, 105 S. W. (2d) 915; Herring v. Franklin, 339 Mo. 571, 98 S. W. (2d) 619; Willhauck v. C., R. I. & P. Railroad Co., 332 Mo. 1165, 61 S. W. (2d) 336; Monroe v. C. & A. R. Co., 297 Mo. 633, 257 S. W. 469; State ex rel. Hines v. Bland (Mo.), 237 S. W. 1018; Kelsey v. Mo. Pac. Ry. Co., 129 Mo. 362, 30 S. W. 339.] We hold that the trial court correctly ruled this conduct to be contributory negligence as a matter of law.

On the humanitarian submission the only points raised are on defendants' instructions and argument. Plaintiff assigns as error the giving of defendants' instruction D, which was as follows:

"The Court instructs the jury that the engineer or fireman in charge of a locomotive running a train, upon seeing an automobile approaching a crossing, while such automobile is still in a place of safety and at such distance from the crossing as to yet allow the driver a reasonable time to stop before going upon the crossing in front of such train, is entitled *to assume that the driver of such automobile will use due care to stop before going upon the crossing and into danger of being struck by such train;* and the Court further instructs you that neither the engineer nor fireman on the train is under any duty to blow the whistle or to attempt to stop or slacken the speed of the train until he sees, or in the exercise of ordinary care should see, that such automobile was not going to stop and was going to enter into a position of danger.

"In this connection the Court further instructs you that if you find and believe from the evidence that as soon as it was apparent to the fireman or engineer on the train, or would have been apparent to a reasonably prudent and careful fireman or engineer under similar circumstances, that the automobile driven by the plaintiff was going to enter a position of imminent peril it was then too late for the fireman and engineer in the exercise of ordinary care, with the means and appliances at hand and with safety to the train and passengers thereon, to stop or slacken the speed of the train or give a warning which would have been effective, in time to avoid a collision, then plaintiff is not entitled to recover and your verdict should be in favor of the defendants."

Plaintiff says that the italicized part of this instruction brought to the jury's attention the antecedent negligence of plaintiff, and duly limited the danger zone. We must consider this instruction upon defendants' version of what occurred. [Branson v. Abernathy Furniture Co., 344 Mo. 1171, 130 S. W. (2d) 562.] Defendants' fireman, who was on the left (west) side of the passenger engine, testified that he first saw plaintiff's car approaching on Baxter street ninety or one hundred feet from the tracks; that the front end of the engine was then a hundred and twenty or thirty feet away from the crossing;

that plaintiff's automobile was running about fifteen miles per hour; and that their train was running around twenty miles per hour. He further testified: "When I first saw the automobile he was far enough away from the crossing that of course I didn't think anything about it; I thought, like other cars, he would drive on down there and stop; he wasn't driving fast, when he got near the crossing why he would stop; we see these things every day. . . . When he had gotten down to where I thought he should show some signs of stopping, if he was going to stop for the crossing, why I began to see that there might be danger if he didn't. . . . When I saw he hadn't made any effort to stop, I notified the engineer (who was on the other side) to stop, to hold it, or words to that effect, and then I reached over and put my hand on the whistle on my side—it was operated over there, and the engineer set the brakes in emergency and the car kept driving on the track, and we went down and hit him." The fireman also said that, when he whistled, plaintiff's automobile was "around 50 to 60 feet" of the track; that the train was then "around 80 to 90 feet" from the crossing; and that he "couldn't tell that he (plaintiff) either increased or decreased his speed" as he continued on to the tracks. Defendants had other corroborating witnesses who saw the collision and who testified that plaintiff never did stop his automobile before driving upon the tracks, but continued over the crossing without increasing or diminishing his speed.

Under defendants' evidence, it is clear that the decisive question of fact for the jury (if they believed it) was whether the fireman acted as soon as plaintiff's conduct would indicate to a reasonable man (in the exercise of ordinary care) in his position, that plaintiff was oblivious to the approach of the train, and intended to continue across the tracks. This could only appear (under defendants' evidence) from plaintiff's near approach without slowing down (unless the fireman was close enough to observe which way he was looking); and it was for the jury to decide when (under the evidence they believed) these appearances were such as to reasonably require action. Under instruction D the right to assume that plaintiff would stop was limited to when "such automobile *is still in a place of safety* and at such a distance from the crossing as to yet allow the driver a reasonable time to stop." Likewise it informed the jury that the fireman's duty begins when "he sees, or in the exercise of ordinary care should see, that such automobile was not going to stop and *was going to enter* into a position of danger." This, as hereinafter shown, was very favorable to plaintiff. There can be no doubt about instruction D correctly stating the law; and in Clark v. A., T. & S. F. R. Co., 319 Mo. 865, 6 S. W. (2d) 954, this court reversed and remanded the case for another trial solely on the ground that the trial court refused to give such an instruction (6 S. W. (2d) l. c. 96) requested by defendants. [See also instruction 3 discussed in Stanton v. Jones, 332 Mo.

631, 59 S. W. (2d) 648.] Instruction A in the Clark case was substantially the same as the first paragraph of instruction D objected to in this case. (The second paragraph of instruction D is a proper converse humanitarian instruction; see Branson v. Abernathy Furniture Co., supra.) This court said in the Clark case: "If the engineer of a train sees an adult person approaching the track, unless there is something in his actions or manner to indicate the contrary, the engineer has the right to assume that such person will stop before going on the track, or, if on the track, that he will step off into a place of safety. This, in substance, has been ruled so often that we deem it unnecessary to cite cases."

Likewise, the American Law Institute Restatement of Torts, in explanation of Section 480, states:

"The defendant is entitled to assume that the plaintiff is paying or will pay reasonable attention to his surroundings; until he has reason to suspect the contrary, he has no reason to believe that the plaintiff is in any danger. Therefore, the defendant is liable only if he realizes or has reason to realize that the plaintiff is inattentive and consequently in peril. Thus, if an engineer of a train approaching a level highway crossing sees a traveler approaching the track on foot or in a vehicle, he is not required to take any steps either to warn the traveler by an additional blast of his whistle or to bring the train under special control, since he is entitled to assume that the traveler has discovered or will discover the oncoming train and will stop before reaching the crossing. . . . If there is anything in the demeanor or conduct of the plaintiff which to a reasonable man in the defendant's position would indicate that the plaintiff is inattentive and, therefore, will or may not discover the approach of the train, the engineer must take such steps as a reasonable man would think necessary under the circumstances." [See Womack v. Mo. Pac. R. Co., 337 Mo. 1160, 88 S. W. (2d) 368, for discussion of this situation; see also Branson v. Abernathy Furniture Co., supra; Elkin v. St. Louis Public Service Co., 335 Mo. 951, 74 S. W. (2d) 600; Stanton v. Jones, 332 Mo. 631, 59 S. W. (2d) 648; Smith v. Wells, 326 Mo. 525; 31 S. W. (2d) 1014; Bases of the Humanitarian Doctrine Reexamined, McCleary, 5 Mo. Law Rev. 56, l. c. 65-66.]

As to plaintiff's first contention (that plaintiff's antecedent negligence was brought in), it seems clear that the assumption stated in instruction D is really an assumption that plaintiff was not oblivious, when he was approaching the crossing but still at such a distance as to be in a place of safety. We think it would be better to leave out of the italicized part of instruction D the words "use due care to," so it would only state an assumption that plaintiff would stop, or better still, to directly state an assumption against obliviousness. In Lynch v. Baldwin (Mo.), 117 S. W. (2d) 273 (upon which plaintiff relies), we held it was proper to refuse an instruction which stated: "That

those operating the train 'had a right to assume' that plaintiff *would exercise the highest degree of care for his own safety*; that they 'had a right to assume that plaintiff was alert to the dangers of a railroad crossing' and would 'check his progress before going' upon the track, or 'entering into a danger zone,' and that he 'would not leave a place of safety and attempt to cross the tracks *without first exercising the highest degree of care* to ascertain if a train was approaching." We said that these statements were "directed at the negligence of plaintiff and would suggest to the jury that plaintiff could not recover if the jury believed he was negligent in not exercising the highest degree of care for his own safety." Quaere: Could "exercising the highest degree of care for his own safety" refer to anything other than contributory negligence? Nevertheless, that was not a ruling that it would necessarily be reversible error to give such an instruction. (This is also true of Larey v. M.-K.-T. R. Co., 333 Mo. 949, 64 S. W. (2d) 681, also relied on by plaintiff, in which the refused instruction did not even mention defendants' humanitarian duty.) The instructions, in Lynch v. Baldwin, supra, and Larey v. M.-K.-T. R. Co., supra, certainly emphasized the matter of plaintiff's care far more than they did the assumption against obliviousness. The contrary is true here. If the trial court should grant a new trial on the ground that such an instruction was misleading (which is to some extent a matter of discretion), we would be inclined to uphold it. Here, however, the trial court held the other way by overruling the motion for new trial. Nevertheless, we call attention to the criticism made in Branson v. Abernathy Furniture Co., 344 Mo. 1171, 130 S. W. (2d) l. c. 571, of prefacing a statement as to when the defendant's duty begins, with what the defendant, "had a right to assume" about what the plaintiff would do. We again point out that the assumption to which a defendant is entitled, in such circumstances, is an assumption that the plaintiff is not oblivious, until he shows reasonable appearances of obliviousness. Therefore, a defendant's instruction could not be criticized as misleading (because of directing attention to antecedent negligence) if it would plainly and directly state an assumption against obliviousness, instead of putting the matter in this roundabout way. However, we hold that this instruction was not prejudicially misleading *per se,* as injecting plaintiff's antecedent negligence, and since the submission, considered as a whole, was, as hereinafter pointed out, more favorable than plaintiff was entitled to have, we overrule this contention against instruction D.

As to the second point against instruction D (that it unduly limited the danger zone), plaintiff says "that it limits and defines the danger zone to a point where the car was in '*danger of being struck by such train.'* " While it is true that obliviousness extended the zone of imminent peril beyond the railroad track, still the plaintiff's imminent peril was "*danger of being struck by such train,*"

because he was obliviously approaching its path; and this instruction really referred to his appearance of "going upon the crossing and into the danger of being struck." Plaintiff's argument is that "where the danger zone commenced in the instant case was not where the plaintiff's car would have been 'struck by such train', but a place where, under all the facts and circumstances, the plaintiff was observed *approaching a place of imminent peril*;" and that instruction D "omits any mention of the duty, not only to discover the plaintiff in the position of imminent peril, but to discover the plaintiff *entering into a position of imminent peril*." Plaintiff relies upon language in some former cases, now disapproved, such as Hencke v. St. L. & H. R. Co., 335 Mo. 393, 72 S. W. (2d) 798, in which it is said that "the danger zone extends over the distance traversed by plaintiff after he was observably *approaching a place of imminent peril*." Plaintiff's main instruction herein authorized recovery if plaintiff "was in or *about to go into a place of imminent peril*." This court en banc in Buehler v. Festus Mercantile Co., 343 Mo. 139, 119 S. W. (2d) 961, held that the defendant's duty, under the humanitarian doctrine, "does not arise *until* a situation of peril arises;" and that the phrase, "approaching . . . a position of imminent peril," in its ordinary meaning, "indefinitely extended the field within which vigilance under the humanitarian doctrine was exacted." This has since been followed in Division 1 in Hilton v. Terminal Railroad Assn., 345 Mo. 987, 137 S. W. (2d) 520. Such terms as "approaching" or "coming into" or "about to go into" a position of imminent peril obviously expand improperly the defendant's duty under the humanitarian rule, so that it would begin before the plaintiff is *in* a position of imminent peril. It is the reasonable appearance of an intention to immediately go into the path of an oncoming vehicle without knowing of its approach, and actually not knowing, that places a person in a position of imminent peril from it, while far enough beyond its path to still be able to stop in time to avoid it if he knew it. [Smithers v. Barker, 341 Mo. 1017, 111 S. W. (2d) 47; Lotta v. Kansas City Public Service Co., 342 Mo. 743, 117 S. W. (2d) 296.] Thus it is plain that plaintiff obtained a more favorable submission than he was entitled to have and that this contention against instruction D must be overruled.

Plaintiff makes the further complaint against this instruction and also defendants' instruction B that it required only warning by whistle, and that it required, "a warning which would have been effective." The criticized part of instruction B is "to have sounded an effective warning whistle, that is, one which would have awakened plaintiff to a realization of his peril and thereby have averted the collision." Plaintiff cites Rollison v. Wabash R. Co., 252 Mo. 525, 160 S. W. 994, which says "if the ringing of the bell is not sufficient, then it is the duty of the trainmen to blow the whistle." It is common

knowledge and common sense that an engine whistle is a better warning than an engine bell and plaintiff could not be prejudiced by requiring the best possible warning. Likewise, plaintiff could not complain of the requirement that such whistle be one that would be effective to awaken him to his peril and thereby avert the collision. Clearly these instructions reading them together required warning to be given in time to accomplish such purpose if there was time to do so after he was in a position of imminent peril. Plaintiff says that this requirement as to *effective* warning allowed defendants to argue his antecedent negligence. If, as plaintiff's argument seems to imply, it required a louder and more continuous warning to stop him than would have been necessary for a man of ordinary care and prudence, then the requirement that it be *effective as to him* placed a greater burden on defendants than the law imposed. Therefore, this contention must also be overruled.

Plaintiff further assigns error as to oral argument by defendants' counsel. Plaintiff says they were permitted to argue plaintiff's antecedent and contributory negligence. The only exception that appears in the record, to a ruling upon this part of the argument, is as follows:

"The higher the speed the more time required to stop, and they were not required to stop at all until he reached that place of imminent danger. Under the testimony in this case, there is twelve to fourteen feet—the witness that works on the section says fourteen feet—between these two tracks. Under his own testimony, there was no danger there from that freight train moving at a speed less than a man could walk. He knew he was in no danger of the freight train. He could have even got over that track and have had plenty of room to stop between the two tracks—a place of safety ten, twelve or fourteen feet—

"By Mr. MYRES: He has argued continually contributory negligence. If I can't be allowed to argue the negligence of the defendant he should not be allowed to argue contributory negligence because that is not a defense under the instructions of the court.

"By the COURT: He is arguing, as the court understands it, on the theory of his position of oblivion to peril. That is the way I understand it to be argued. (Exception shown in record.)"

Of course, counsel had the right to argue the evidence, most favorable to defendants, as to when and where plaintiff's position of imminent peril began. Defendants were arguing that plaintiff was in no peril from the freight train, so far away and moving so slowly, even if he stopped on the track upon which it was approaching, and that its presence could not extend the zone of imminent peril. Plaintiff says that his obliviousness was admitted and was not an issue. However, the question of when his obliviousness would become reasonably apparent to the fireman, on the passenger engine, was the decisive

issue because that determined when the fireman's duty to plaintiff commenced. Clearly the trial court's ruling limited defendants' argument to such issues, and plaintiff made no further request.

■ Plaintiff also assigns as error "permitting the attorney for defendants in his argument to the jury to comment upon the absence of the witness Dr. O. A. Sale," and "refusing to allow plaintiff's counsel to tell why Dr. Sale had not been brought in by plaintiff;" also that the court "in sustaining said objection, made prejudicial remarks to the jury." There is nothing for review as to the argument of defendants' counsel because there is no exception to it in the record. As to the latter incident the record shows, the following:

"Why didn't we bring Dr. Sale here to testify, and I am going to tell you men now why we didn't bring him: Because he was a Frisco doctor, and Mr. Mann knew that he was a Frisco doctor—

"By Mr. MANN: I object to that statement as improper; there isn't a word of evidence in this case on which to base it—

"By Mr. MYRES: If the court please, I was allowed by your honor to answer him.

"By the COURT: The court did not contemplate that you would bring in a question of that kind because you read the deposition of the doctor yourself. If you read the deposition, the fact that he worked for the Railroad Company would not be a reason for failing to have him here, and to that extent, I do not think that the jury should consider whether he did or did not work for the Railroad Company. Objection sustained. (Exception in record.)"

There was no evidence in the record as to Dr. Sale's relations with defendants. Dr. Sale was plaintiff's first physician and plaintiff stayed in his private hospital for about ten days. He saw plaintiff on several occasions after he left his hospital. Plaintiff introduced in evidence the deposition of Dr. Sale taken some time before the trial, in which he said that it was "too early," when he had checked him, "to give an opinion as to whether or not he would have future disability as a result of these injuries." Other physicians testified as to examinations at later dates. Plaintiff's argument was in the nature of an attempt to impeach the testimony of a witness whose testimony he had introduced and upon which he relied. Moreover, this, as well as the court's rulings as to admissibility of certain testimony of other doctors, as to which plaintiff also assigns error, all went only to the extent and permanancy of plaintiff's injuries. It was not denied that plaintiff suffered some severe injuries. However, the jury found against plaintiff on the issue of whether defendants were guilty of any actionable negligence. Therefore, rulings, on matters relating only to the amount of damages to which plaintiff might be entitled to receive if defendants were liable, could not have been prejudicial so as to constitute reversible error. [Clark v. Reising 341 Mo. 282, 107 S. W. (2d) 33; Wolfson v. Cohen (Mo.),

55 S. W. (2d) 677; Simmons v. Wells, 323 Mo. 882, 20 S. W. (2d) 659; Gricus v. United Rys., 291 Mo. 582, 237 S. W. 763.] The judgment is affirmed. *Bradley* and *Dalton, CC.*, concur.

PER CURIAM:—The foregoing opinion by HYDE, C., is adopted as the opinion of the court. All the judges concur.

*NOTE: Opinion filed at September Term, 1939, March 6, 1940; motion for rehearing filed; motion overruled at May Term, 1940, May 7, 1940.