HUGH BRANSON, Appellant, v. ABERNATHY FURNITURE COMPANY.— 130 S. W. (2d) 562.

Division One, July 7, 1939.

*McVey & Randolph* for appellant.

1174

*Cooper, Neel & Sutherland* and *Frank J. Rogers* for respondent.

HYDE, C.—This is an action in two counts, one for $25,000 damages for plaintiff's personal injuries, and the other for statutory damages for the death of plaintiff's wife. The case was submitted solely upon humanitarian negligence. The jury found for defendant and plaintiff has appealed.

Plaintiff assigns as error the giving of certain instructions for defendant. However, defendant contends that it is immaterial what instructions were given because plaintiff failed to make a jury case under the humanitarian rule. We will, therefore, first state the facts which the evidence tended to show view most favorably to plaintiff. The only eyewitnesses were plaintiff and defendant's driver. The

1176

collision occurred on Highway 36 in Livingston County. Plaintiff was driving east, in rainy weather, on an S curve going downhill. As he rounded the last curve before reaching the straight part of the road, traveling from thirty-five to forty miles per hour, the right front wheel of his car went off the south edge of the pavement (concrete slab 18 feet wide) onto the muddy shoulder. About the time his wheel went off, he saw defendant's car (coming west at thirty-five to forty miles per hour on the north side of the road) and "thought at that time it was about 200 feet" away. Later, after he had visited the scene of the accident and stepped off distances with reference to landmarks, he decided that it was farther away than that. He fixed its position with reference to electric light poles. There was a gravel road running south from the pavement just east of the point of collision and plaintiff based his estimates on the distance from the part of the curve, where his wheel went off the pavement, to this road, the width of this road, and the distance to the light pole beyond. (Its approach flared out to 81 feet where it reached the pavement.) He said that defendant's car had not reached the gravel road when he first saw it. His wheel was off the slab for "probably eight or ten feet," and he "turned it back on the slab . . . cut it rather sharply . . . overcoming not only the pull on the wheel (of the muddy shoulder which was two inches lower than the pavement) but also the curve." Plaintiff's car "as it came up on the slab it began skidding." He had previously (in his deposition) estimated that defendant's car was from 150 to 200 feet away when his car first came back on the slab but at the trial, based on his visit to the scene and the measurements then made, he estimated it to be 240 feet. He said that defendant's car never swerved or slackened its speed; that defendant's driver, in a conversation later at the hospital, said he saw plaintiff's car come back on the slab "just about where the curve begins to straighten up;" and that "he said his car was about 200 feet east." Plaintiff said: "I asked him why he didn't stop and he said, 'well he didn't know why.' " Plaintiff also said that he tried "to straighten the car out and get it out of the skid" by putting his "foot on the brake and then releasing it so it wouldn't skid and so it would start rolling;" that he estimated the distance it skidded, after coming back on the pavement to be "about sixty or seventy feet;" that the closest his left front wheel came to the north edge of the slab was "two or three feet;" that he had slowed his car down to "ten or fifteen miles an hour" so that it rolled on the four wheels for "ten or twelve feet" before the collision; that defendant's car "was sixty or eighty feet down the road when plaintiff's car" came out of the skid; and that at the time of the collision his "car was facing northeast, more east than north, but the wheels were still turning a little bit to the right, . . . pulling around to come into the other lane;" but that "it never got to where it was traveling south."

Plaintiff's estimates were corroborated by two witnesses, who arrived on the scene after the accident, and who testified that they examined wheel marks on the pavement. They both said there was one muddy broken zigzag track from the south shoulder, west of the gravel road, angling northeast (more east than north) to a point about two feet north of the center line of the pavement. They estimated that the mark on the south shoulder was from eight to ten feet long; that the place where the muddy wheel mark went from the shoulder on to the pavement was from seventy-five to eighty feet west of where the cars were found after the collision; that the total length of this muddy track was from sixty to seventy-five feet; and that it had the appearance of a skidding wheel. One of these men made a plat to show the course of the muddy track. According to his plat, this track (angling northeast) crossed the black center line about seventy feet from where it came over the south edge of the slab, straightened out somewhat (going more directly east) for about eight feet, and then disappeared. He said that he found plaintiff's car about twenty feet farther east (of this point where the track disappeared) on the south side of the road. Defendant's car was on the north side of the road in the ditch somewhat farther west than plaintiff's car.

There are pictures in the record showing the condition of the two cars after the collision. The garage man, who took charge of them, stated how they were damaged (which corresponds with what the pictures show), as follows:

"The plaintiff's coupe was damaged where the hood connects on the body. The car was not damaged in front. I don't think the radiator was hurt, except where it smashed in a fender on it. The bumper was not bent. The Plymouth coach was damaged in the left front part and side. . . . The right front axle and wheel on Branson's car was bent under the fender and kind of tilted or turned back. The front axle was bent, turned up there like it was hit. The front end of the Keene car kind of rode up over the hood of the Branson car."

A State Highway patrolman also said:

"The Plymouth coupe was damaged on the right side from the front end back to the door. . . . He (plaintiff) told me that just at the time of the crash he had a recollection of seeing the car just as it hit. He also remembered his car being out of control. . . . The right door on the coupe (plaintiff's car) was badly crushed in."

Defendant's driver said in his deposition (offered by plaintiff) that he could have stopped, under the existing conditions and at the speed he was going, "in around 100 feet with reasonable safety to himself and the car and in an emergency." He signed a written statement, prepared by plaintiff's attorney about a week after the collision, which read as follows:

"I was going 40 to 50 miles an hour in about the center of the north

half of the 18 foot slab. I saw another car coming toward me on the south side of the road at about the same speed. When it was about 150 (one hundred fifty) feet away his right wheels ran off onto the south shoulder momentarily and the driver immediately pulled the car back on to the slab and cut sharply across to the north side of the slab. It happened so quick I did not turn or put on my brakes. The front end of my car struck the right front end of the other car which was occupied by Mr. and Mrs. Branson." (At the time of signing this statement, he also assisted in making a plat showing this distance as 150 feet.)

■ Defendant argues the demurrer to the evidence mainly upon the ground that plaintiff's testimony was unbelievable and contrary to physical facts. (As shown by the condition of the cars after the collision.) We are unable to say positively that the cars could not have been damaged in the way they were if the collision happened in the manner stated by plaintiff, which was corroborated by the witnesses who examined the wheel track. It requires a very clear case to hold that positive corroborated testimony is untrue because of impossibility. [Parrent v. M. & O. Railroad Co., 334 Mo. 1201, 70 S. W. (2d) 1068; Bloecher v. Duerbeck, 338 Mo. 535, 92 S. W. (2d) 681.] Considering the distances stated by plaintiff, and the witnesses corroborating him, to be the facts, we think there was a jury case on the ability of defendant's driver to stop his car short of the point of collision, or to sufficiently slacken its speed, in time so that plaintiff (if he was regaining control) could have turned back into the south lane. While time for action was short (even on plaintiff's theory), we find that plaintiff's evidence was sufficient to show a situation where the reasonable appearances were that his car was out of control, immediately after his wheel came back on the slab and began skidding toward the north side of the road. It was defendant's driver's duty to act upon reasonable appearances and at a time when action would be effective if he had time thereafter to do so. [Allen v. Kessler (Mo.), 64 S. W. (2d) 630; Womack v. Missouri Pacific Ry. Co., 337 Mo. 1160, 88 S. W. (2d) 368; Perkins v. Term. Railroad Assn., 340 Mo. 868, 102 S. W. (2d) 915.] If his car had not reached the gravel road when plaintiff's car came back on the road, we think the jury could reasonably infer that he did have time to stop, or sufficiently slacken the speed of his car so that plaintiff could have avoided it. We hold that the court properly overruled defendant's demurrer to the evidence.

■ Before considering the instructions, we will state the facts as shown by defendant's evidence. Defendant's driver denied the conversation which plaintiff said took place at the hospital. He said that the distance of 150 feet between the two cars (stated in his written statement) was suggested and argued to him by plaintiff's attorney and that he accepted it at that time, and signed the statement without

changing it. He testified at the trial that he thought the distance was less than that when he saw plaintiff's car run off the pavement, but said he could not give an accurate estimate of it because it happened so suddenly. He testified further, concerning the occurrence, as follows:

"As we drew nearer this car ran off of the pavement onto the shoulder. Then it was off just a moment, just ran a little ways off, and then in attempting to get back on he flashed right across in front of me just as we drew abreast and I was almost abreast of him when he shot across there. . . . I didn't do much of anything. It was so quick. I remember taking my foot off the gas and then the first thing I knew my head hit the steering wheel and that was all. . . . His was a skidding motion, not forward or sideways, and it just loomed up like that (illustrating) and I just stiffened. . . . A lurch or careening would be a good word. . . . As to whether the four wheels were turning, or turning and sliding both, it was coming too fast for me to tell. . . . It blurred up, rushing up like that (illustrating) faster than the eye could focus. Of course it didn't go at right angles and he didn't go straight. . . . At the moment of impact I probably slowed up a little, not appreciably, took my foot off the gas, but after all practically it was the same speed. . . . Q. Just what was the position of the cars when something unusual did develop to Mr. Branson's car? A. I don't know exactly. I think I guessed it once at 150 feet. Q. In point of time how long, how much time elapsed between the time that Mr. Branson's car went off the shoulder until the time of the impact, can you give us some idea of that? A. Just about a second I guess or part of a second. Just long enough for him to get across the road. Q. There was nothing unusual in the appearance of his car when you first saw it? A. No, sir."

Defendant also had evidence of admissions made by plaintiff (to nurses at the hospital), as follows:

MRS. BARNES: "He told me . . . it was raining and slick and his car skidded and he got off on the other side, you know, and he tried to get back and lost control of his car and that was about all he knew. . . . He told me he didn't see any car."

MISS EGBERT: "He told me . . . he lost control of the car, going over onto the shoulder and in righting the car he went directly across the road. . . . He said he didn't see the other car . . . at any time."

Plaintiff explained this by saying that he "was groggy, dazed and very confused for several days" after the collision.

Plaintiff assigns as error the giving of defendant's Instructions D. F. G. and K, which were, as follows:

"D. The court instructs the jury that the charge laid by the plaintiff against the defendant in this case is one of negligence. Recovery

may not be had on a charge of negligence except when such charge is sustained by the preponderance, that is, the greater weight of the credible evidence to the reasonable satisfaction of the jury.

"It does not devolve upon the defendant to disprove said charge, but rather the law casts the burden of proof in reference to said charge upon plaintiff and said charge of negligence must be sustained by the preponderance, that is, the greater weight of the credible evidence to the reasonable satisfaction of the jury. If, therefore, you find the evidence touching the charge of negligence against the defendant 'as submitted in these instructions' does not preponderate in favor of the plaintiff, or is evenly balanced, then, in either event, plaintiff is not entitled to recover against the defendant and your verdict must be in favor of the defendant.

"F. The court instructs the jury that the driver, Mr. Keene, had a right to assume that the plaintiff would drive his automobile on his (plaintiff's) right side of the highway and would not suddenly cause said automobile to be driven to the left of the center line of said highway and closely in front of defendant's approaching automobile, if you find that it was 'so driven;' and the court further instructs you that there was no duty on defendant Keene to slow down or stop or swerve his automobile until it became apparent to him, in the exercise of the highest degree of care, that plaintiff's automobile was being driven to the left and into the pathway of defendant's automobile, if so; and the court further instructs you that if you find that plaintiff's automobile was driven to the left of the center and to the north side of the highway and into the pathway of defendant's automobile so closely in front of defendant's automobile that the defendant Keene could not, by the exercise of the highest degree of care, 'as submitted to you in Instruction Number 1,' have avoided striking said automobile, then plaintiff is not entitled to recover and your verdict must be for defendant on both counts.

"G. By 'position of imminent peril,' as used in the instructions of the court, is not meant a place wherein there is just a mere bare possibility of an injury occurring; it means a place and position wherein there is certain danger.

"K. The court instructs the jury that if you find and believe from the evidence that on the occasion mentioned in evidence, plaintiff so operated his automobile as to cause same to suddenly go from a position of safety on his right side of the highway to the left of said highway and closely in front of defendant Keene's automobile; and if you further find and believe from the evidence that the acts of plaintiff in so doing, if you so find, were the sole cause of whatever injuries, if any, plaintiff and his wife sustained on said occasion, and said injuries were not due to any negligence on the part of defendant Keene, in any of the particulars set out in other instructions herein, then in that case, plaintiff is not entitled to recover and you will find

your verdict for the defendant on both counts." (Quoted parts in these instructions were added by trial court.)

As to Instruction D., plaintiff contends that it unduly emphasized the burden of proof. This instruction is exactly the same as the instruction approved by Division Two of this court (citing cases from both Divisions in support of its ruling) in Doherty v. St. Louis Butter Co., 339 Mo. 996, 98 S. W. (2d) 742. This assignment is overruled.

As to Instruction G, plaintiff contends that it is confusing and misleading and has the effect under the circumstances of this case to unduly limit the danger zone. An instruction in this same language was approved by Division Two of this court in Wallace v. St. Joseph R., L., H. & P. Co., 336 Mo. 282, 77 S. W. (2d) 1011, saying that it "does not purport to limit or to circumscribe the danger zone;" but that "it merely defines the meaning of the phrase 'place of imminent peril' used in the instructions of both parties" and "does so in language essentially the same in meaning as has frequently been used by this court in defining the danger or 'imminent peril' necessary to invoke the humanitarian rule" (citing and quoting from cases from both Divisions); and that "it is apparent from the foregoing that the definition of 'place of imminent peril' contained in Instruction L is in accord with what we have held the term 'imminent peril' to mean in cases such as this." The same definition has since been repeated in Kirkham v. Jenkins Music Co., 340 Mo. 911, 104 S. W. (2d) 234; Mahl v. Terrell, 342 Mo. 15, 111 S. W. (2d) 160; Bates v. Brown Shoe Co., 342 Mo. 411, 116 S. W. (2d) 31; Lotta v. Kansas City Public Serv. Co., 342 Mo. 743, 117 S. W. (2d) 296. This assignment is overruled.

Plaintiff makes its principal attack on defendant's Instruction F. He says that it contained "an abstract legal statement" instead of hypothesizing facts. Watts v. Moussette, 337 Mo. 533, 85 S. W. (2d) 487 (cited by plaintiff and other similar cases), referred to sole cause instructions, which hypothesized the plaintiff's negligence as the sole cause and which must be done by requiring a specific finding of facts showing a situation under which the plaintiff's acts would be the sole cause. We classify Instruction F as a converse humanitarian instruction because it authorized a verdict on the basis of what defendant's duty was, rather than on what the plaintiff did, as was true of defendant's sole cause Instruction K. Instruction F authorized a verdict for defendant if the jury believed that defendant's evidence negatived one of the essential elements of the humanitarian doctrine submitted by plaintiff, to-wit: The ability of defendant's driver to have avoided a collision after plaintiff was in a position of imminent peril. A converse humanitarian instruction does not submit an affirmative defense, and, therefore does not need to be as specific concerning plaintiff's acts as a sole cause instruction. However,

we find that Instruction F did specifically hypothesize the facts material to the issue of defendant's duty. A defendant is always (unless he admits negligence) entitled, in a case submitted against him under the humanitrian rule, to an instruction submitting as his defense, facts (shown by the evidence) tending "to disprove one or more of the basic facts on which that rule rests." [Doherty v. St. Louis Butter Co., 339 Mo. 996, 98 S. W. (2d) 742.] He is also entitled to a sole cause instruction (Doherty v. St. Louis Butter Co., supra; Borgstede v. Waldbauer, 337 Mo. 1205, 88 S. W. (2d) 373), if there is evidence on which to base it. [Crews v. Kansas City Public Serv. Co., 341 Mo. 1090, 111 S. W. (2d) 54.] In this case defendant had both, and both of them not only hypothesized plaintiff's acts but also referred to defendant's duty as submitted by plaintiff. ("F" required finding that "Keene could not . . . as submitted to you in Instruction No. 1 have avoided striking said automobile;" while "K" required finding that plaintiff's "injuries were not due to any negligence on the part of defendant Keene in any of the particulars set out in other instructions herein.") In this situation, if the instructions do not conflict, they should be read together. [Burow v. Red Line Service, 343 Mo. 605, 122 S. W. (2d) 919.]

Since plaintiff contends that Instruction F improperly narrows the danger zone in conflict with his main Instruction 1, we set out that part of Instruction 1 material here, as follows:

"And if you find that the plaintiff *steered said automobile to the left* and brought said right front wheel back upon the paved portion of said highway, and . . . that the plaintiff lost control of said automobile, if you so find, and that said automobile went in a diagonal direction to the northeast, if so, *and to the plaintiff's left hand side of said pavement,* if so, *and into the path* of a westbound Plymouth automobile operated by H. V. Keene, and if you further find that plaintiff's automobile was struck by said westbound Plymouth automobile, . . . and if you further find that prior to plaintiff's automobile being struck by said westbound Plymouth, if so, plaintiff's said automobile in which his said wife was riding, if so, was approaching and immediately coming into a position of imminent peril and danger of being struck by said westbound Plymouth automobile and that the plaintiff was unable to extricate his said automobile therefrom . . . and if you further find that the said Hall v. Keene, saw, or in the exercise of the highest degree of care could have seen, plaintiff's automobile was approaching and immediately coming into such position of imminent peril, if so, and that the plaintiff was unable to extricate said automobile, therefrom, . . . in time thereafter, by the exercise of the highest degree of care, if so, with the means at hand, if so, and with reasonable safety to himself and the automobile he was driving, if so, to have stopped said westbound Plymouth automobile, if so, or slackened the speed thereof,

if so, or turned the same to his left, if so, and thereby have avoided striking plaintiff's automobile'' (then the verdict must be for plaintiff).

Plaintiff says that Instruction F is in conflict with that part of Instruction 1 ''which required defendant's driver to act when he saw plaintiff's car 'approaching and immediately coming into a position of peril,' which authorized the jury to consider the situation from the time plaintiff's car ran off onto the shoulder.'' We think this is true, but we also are sure that such a construction of plaintiff's Instruction 1 would improperly extend the zone of imminent peril, because defendant's driver's duty under the humanitarian rule did not commence at the time when plaintiff's car ''ran off pavement onto the shoulder.'' Plaintiff was not then in a position of imminent peril from defendant's car. He never would have been in a position of imminent peril from it if he had kept that position. He no doubt was in danger of injury both because he might not have been able to get his car back on the highway at all and because he might get it back in such a way that he would immediately thereafter get it into a position of peril from defendant's car. It might perhaps have been negligence for defendant's driver to fail to see and comprehend this situation but that would have been primary negligence not humanitarian. Such antecedent primary negligence could have no place in a submission under the humanitarian rule. Moreover, this court (en Banc) has recently, for the same reason, condemned the use of the word ''approaching'' in this manner in a humanitarian instruction. [Buehler v. Festus Mercantile Co., 343 Mo. 139, 119 S. W. (2d) 961, l. c. 970.] In view of this incorrect extension of the zone of imminent peril made by plaintiff's Instruction 1, this objection to defendant's Instruction F is without merit.

Plaintiff further argues that Instruction F improperly restricted the danger zone so as to eliminate from consideration the evidence that plaintiff's car skidded down the highway for 70 feet or more toward the path of defendant's car before it crossed the center line; and that it expressly limited the commencement of the duty of defendant's driver to the time when plaintiff's car had crossed the center line; and was in the path of defendant's automobile. Plaintiff cites Collins v. Beckmann (Mo.), 79 S. W. (2d) 1052; Martin v. Fehse, 331 Mo. 861, 55 S. W. (2d) 440; Gray v. Columbia Terminals Co., 331 Mo. 73, 52 S. W. (2d) 809; Burke v. Pappas, 316 Mo. 1235, 293 S. W. 142; see, also, Prater v. Rausch, 344 Mo. 888, 129 S. W. (2d) 910, decided concurrently herewith. This line of cases was considered in Kirkham v. Jenkins Music Co., 340 Mo. 911, 104 S. W. (2d) 234, in which they cited to support the same contention (improperly narrowing the danger zone) made against an instruction therein, in which the duty of the driver was stated in language similar to that used in Instruction F herein. In the Kirkham case, de-

fendant's evidence was that its driver was driving north along the
west side of a safety zone in the street; that plaintiff was walking
north just inside the west line of the safety zone; and that plaintiff
suddenly turned and, without looking south, took a step west into
the path of defendant's car when it was only a few feet away.

This court distinguished those cases on the ground that they were
all right angle crossing cases with wide danger zones because of
obliviousness, and held the instruction proper under the facts of the
Kirkham case, saying:

"It will be noted that the facts in each of the above cases disclosed
a certainty of a collision if the injured party and the car or vehicle
in question continued on their course. In other words, a collision was
certain to follow unless one or the other party changed their course.
For example, in Gray v. Terminals Co., the deceased was crossing a
street from east to west; the defendant's truck was going south; if
both continued on their way without changing their rate of speed, a
collision between them was apparent and certain to occur. This court
ruled, and correctly so, that the peril arose, and the driver of the
truck was bound to take action, under the rules of the humanitarian
doctrine, as soon as he could have discovered, by the exercise of the
highest degree of care, that a collision was imminent. It was ruled
that the peril arose before the deceased was directly in the path of
the truck. This distinction is obvious. In the case now before us
no collision would have occurred if both parties had continued to
travel due north. Of course there existed the possibility that the
plaintiff might change her course and go west. But under the hu-
manitarian doctrine the word 'peril' means certain peril, and not the
bare possibility that a collision might result. [Banks v. Morris &
Co., 302 Mo. 254, 257 S. W. 482; Ridge v. Jones, 335 Mo. 219, 71 S.
W. (2d) 713, l. c. 714, etc. (1, 2); State ex rel. Vulgamott v. Trimble,
300 Mo. 92, 253 S. W. 1014.] Considering the above authorities and
the rules applicable to the humanitarian doctrine, we are of the opin-
ion that the instruction did not unduly limit the danger zone."

We think the situation is the same here, where two cars, both going
at the same speed (about forty miles per hour), were traveling in.op-
posite directions on a pavement eighteen feet wide so that they would
pass within less than six feet of each other if they continued the
course, as they would reasonably be expected to do. Plaintiff's car
never got very far from the center line because only one wheel went
off; the right front and not even the right rear. As in the Kirkham
case, no collision would have occurred if both parties had continued to
travel in the direction they were going, and obviously intended to go,
prior to the time plaintiff's car made the unusual and unexpected
movement to the left. Certainly, it is even more unusual for an auto-
mobile to move to the left of the center line of a highway when meet-
ing another car, than it is for a pedestrian to step outside a safety
zone to cross a city street. It is also apparent, even on plaintiff's

theory, that part of his car got over the center line in much less than seventy feet because the testimony with reference to the seventy feet related to the length of the muddy track made by the south (right) front wheel. Of course, before that track came over the center line, the left side of plaintiff's car had crossed it if it skidded in the manner plaintiff stated. We also note that Instruction F did not contain the language (*"directly* into the path" or *"immediately* in the path") criticised in the above cited cases. Furthermore, defendant was not required to base his instruction on plaintiff's evidence. Defendant was no more bound by the repudiated estimate of its driver than was plaintiff by the estimates he changed after his visit to the scene. It had the right to submit the theory shown by its own evidence, namely, that instead of plaintiff's car skidding seventy feet northeast to completely cross the center line, "he flashed right across in front of me just as we drew abreast;" that the motion of plaintiff's car was "not forward or sideways" skidding, but "a lurch or careening," "rushing up" in front "faster than the eye could focus;" and that "just about a second" elapsed from the time plaintiff's car went off the shoulder until the time of the impact, "just long enough for him to get across the road." On the facts, which defendant's driver's testimony tended to show, there was no seventy foot danger zone, but there was instead a sudden unexpected crossing of the center line, which plaintiff had the right to submit, and which if believed would "disprove one of the basic facts" (ability to act after plaintiff's peril arose) essential to a finding that its driver was negligent under the humanitarian rule. [Johnston v. Ramming, 340 Mo. 311, 100 S. W. (2d) 466.] This theory was strongly corroborated by condition of both cars after the collision and by the admissions plaintiff made at the hospital.

Moreover, plaintiff's main instruction, as shown by the italicised portion thereof, used the same language as did defendant's instruction in hypothesizing the movement of plaintiff's car. (The only difference is plaintiff's instruction hypothesized that his "automobile went in a diagonal direction to the northeast and to the plaintiff's left-hand side of said pavement and into the path" of defendant's car; while defendant's instruction hypothesized that his "automobile was driven to the left of the center and to the north side of the highway and into the pathway of defendant's automobile.") Therefore, plaintiff waived any right to complain that this language hypothesizing the course of his car was prejudicial. [Crews v. Kansas City Public Service Co., 341 Mo. 1090, 111 S. W. (2d) 54, and cases cited.] These criticisms of Instruction F cannot be held to show reversible error.

Plaintiff further contends that Instruction F assumes, without supporting evidence, that plaintiff "suddenly caused said automobile to be driven to the left of the center line of the highway and

closely in front of defendant's approaching automobile;'' and that plaintiff's car was "driven" to the wrong side of the highway, contrary to all the evidence in the case that the car was "skidding out of control" down the highway and to the wrong side. It is apparent from the wording of Instruction F that there is no assumption of these facts but that the jury were required to find that these were facts. What we have just said with reference to defendant's evidence shows that there was substantial evidence to support a finding of the facts hypothesized, and, as we stated, defendant was entitled to submit, in defense to the charge of humanitarian negligence, the facts which its evidence tended to show. Defendant was entitled to a verdict if the jury did believe these to be the facts (namely: "That plaintiff's automobile was driven to the left of the center and to the north side of the highway and into the pathway of defendant's automobile so closely in front of defendant's automobile that the defendant Keene could not . . . have avoided striking said automobile"). We also note that plaintiff's Instruction 1 hypothesized that "plaintiff steered said automobile to the left," which surely means the same as "plaintiff's automobile was driven to the left." We, therefore, rule that this language cannot be held to be reversible error.

Plaintiff further contends that Instruction F allowed the jury to consider contributory negligence of plaintiff as a defense. Plaintiff cites Lynch v. Baldwin (Mo.), 117 S. W. (2d) 273, in which this court held that it was proper to refuse an instruction which stated: "That those operating the train 'had a right to assume' that plaintiff would exercise the highest degree of care for his own safety; that they 'had a right to assume that plaintiff was alert to the dangers of a railroad crossing' and would 'check his progress before going' upon the track, or 'entering into a danger zone,' and that he 'would not leave a place of safety and attempt to cross the tracks without first exercising the highest degree of care to ascertain if a train was approaching.' " We said that these statements were "directed at the negligence of plaintiff and would suggest to the jury that plaintiff could not recover if the jury believed he was negligent in not exercising the highest degree of care for his own safety." Instruction F did not refer to the care plaintiff should exercise, his alertness to danger, or his duty to ascertain what was approaching, but was confined to hypothesizing the situation upon which defendant's duty depended. We do not find Instruction F to be subject to the construction that it allowed the jury to consider contributory negligence as a defense. In this connection, however, we think that it would be better for such an instruction to state only when the defendant's duty commenced, instead of prefacing such a statement with what the defendant "had a right to assume." While we do not consider this prejudicial *per se,* if the trial court had granted a new trial on the

ground that it was an overemphasis of the matter, we would be inclined (as in case of a new trial granted because of overemphasis of the burden of proof) to defer to its judgment. [See Pearrow v. Thompson, 343 Mo. 390, 121 S. W. (2d) 811; Arnold v. Alton Railroad Co., 343 Mo. 1049, 124 S. W. (2d) 1092.] However, in this case the trial court overruled the motion for new trial and, from our reading of the record, we do not think it could have affected the verdict. The submission, considered as a whole, was very favorable to plaintiff. The assignment against Instruction F is overruled.

Plaintiff's final assignment is that Instruction K was erroneous because there was no evidence to support the clause thereof that "plaintiff so operated his automobile as to cause same to suddenly go from a position of safety on the right side of the highway to the left of said highway and closely in front of defendant's automobile," and because it failed to exclude plaintiff's contributory negligence from consideration as a defense as suggested in Dilallo v. Lynch, 340 Mo. 82, 101 S. W. (2d) 7, and McGrath v. Meyers, 341 Mo. 412, 107 S. W. (2d) 792. The first criticism is answered by what we have already said concerning defendant's evidence. As to the second, an instruction with these same requirements was approved in Doherty v. St. Louis Butter Co., 339 Mo. 996, 98 S. W. (2d) 742, which was submitted "solely on the humanitarian doctrine." In the Dilallo case (which went to the jury on both primary and humanitarian negligence) this court commented on the Doherty case (and this comment was approved in the McGrath case which was also submitted on both primary and humanitarian negligence), as follows: "When a cause *is submitted under primary negligence and the humanitarian rule,* such instruction should, in order to avoid confusion and conflict, contain the *sole* cause provision and what we may term a *not due* to the negligence of the defendant provision as in the Doherty case, and also a plain direction that contributory negligence is not to be considered in determining recovery under the humanitarian rule." This is a case, like the Doherty case, submitted "solely on the humanitarian doctrine." Moreover, Instruction K did not, as did the instruction in the Meyers case, authorize a verdict for defendant merely because plaintiff's car was driven into defendant's "line of travel" without regard to how close or how suddenly or as to whether defendant was negligent thereafter. Furthermore, plaintiff's Instruction 1 stated that the jury must find for plaintiff (if they found the facts hypothesized) "even though you should further find from the evidence that the plaintiff was guilty of negligence, in allowing and permitting his automobile to get into such position of imminent peril." This was stating the matter very favorably to plaintiff. [See Smithers v. Barker, 341 Mo. 1017, 111 S. W. (2d) 47.] Certainly this statement made it clear that the driver's contributory negligence was

not a defense. It is not necessary that the jury be told this in every instruction.

The judgment is affirmed. *Bradley* and *Dalton, CC.,* concur.

PER CURIAM:—The foregoing opinion by HYDE, C., is adopted as the opinion of the court. All the judges concur, except *Hays, P. J.,* absent.