**Robert H. CAMPBELL, (Plaintiff) Appellant,**

**v.**

**CHICAGO, BURLINGTON AND QUINCY RAILROAD COMPANY, a Corporation, and Clarence Horstmeyer and Jack W. Robb, (Defendants) Respondents.**

**No. 51042.**

Supreme Court of Missouri, Division No. 1.

July 11, 1966.

Motion for Rehearing and to Transfer to Court En Banc Denied Sept. 12, 1966.

Robert T. Ebert, Robert R. Young, and Barksdale, Abbott & Wallace, St. Louis, for appellant.

Lucas & Murphy, Joseph A. Murphy, St. Louis, for respondent, Chicago, B. & Q. R. Co.

Morris, Wuestling & James, William James, St. Louis, for respondents, Clarence Horstmeyer and Jack W. Robb.

HYDE, Judge.

Action for $100,000.00 damages for personal injuries from a collision with the Railroad's engine; verdict and judgment for defendants and plaintiff has appealed. The case was submitted on humanitarian doctrine negligence; and defendants' brief contains no point claiming plaintiff failed to make a submissible case.

Plaintiff's testimony was that he was driving south on Highway 161 about 2:00 P.M. on December 22, 1961, toward the town of Buell. The weather was overcast with mist but he had the window on the driver's side open. He was not familiar with the road, but it was straight for 1000 feet north of the railroad crossing and slightly upgrade. Defendant Railroad's tracks ran east and west, crossing the Highway about 350 feet east of the Buell depot. (This is distance shown on defendants' photographs in evidence.) About 500 feet north of the crossing there was a sign with "City Limits—Buell" on it. About 300 feet north of the crossing there was a railroad crossing sign. Plaintiff's speed was about 50 miles per hour when he passed these signs. He looked west when he reached the railroad crossing sign but could not see much of the track because of brush along the west side of the road, beginning 235 to 250 feet north of the crossing. He looked east and saw nothing. He would have had a clear view of track to and beyond the depot at 213 feet but continued at 50 miles per hour until he was about 125 feet north of the tracks when he looked west again and saw the engine opposite the depot. The train was going about 40 miles per hour and he heard no whistle or bell at any time. He put on his brakes hard and seeing a gravel service road running west from the Highway along the tracks attempted to turn into it. When he reached it, his speed was about 10 miles per hour but his car was skidding. Between 10 and 15 feet west of the Highway the left front part of his car collided with the left front part of the engine behind the front step. Defendants' evidence was that the collision was entirely on the traveled part of the Highway. Plaintiff said he could have brought his car to a stop at 50 miles per hour within 175 feet after the first appearance of danger.

Defendant's engine was being operated by the fireman J. W. Robb, who was on the right (south) side of the engine. The engineer Clarence Horstmeyer was on left (north) side and saw plaintiff approaching on the Highway. He did not say anything to Robb until the collision occurred at the crossing, after which Robb by emergency application of the brakes stopped the train in about 750 feet. (Horstmeyer's estimate was 650 feet.) Defendants' evidence was that at 40 miles per hour the train would go from 200 to 240 feet after application of the brakes before there would have been any appreciable slackening of its speed. However, Robb answered "yes" to the following question: "[I]f that train was four hundred feet back from the intersection and you had applied that train in emergency situation, then there would have been an appreciable slackening of speed before you reached the intersection, wouldn't there?" Robb, Horstmeyer and a track laborer at the Buell station all testified that the horn of the Diesel engine was started more than a quarter of a mile west of the station and continued blowing standard crossing whistles (two longs, a short, and a long) across a county road about 800 feet west of the Highway and until reaching the Highway. There was a building used as a fertilizer plant just east of the county road. The fertilizer plant on the north side of the

tracks was about the same distance west of the depot as the depot was west of the Highway. Horstmeyer first saw plaintiff's car before the engine reached the fertilizer plant. He could not see plaintiff's car while the engine was passing the fertilizer plant but when he saw it again, it was about 400 feet from the track when the engine was near the depot and estimated its speed at 50 miles per hour and the speed of the train at 40 miles per hour. He said he continued to watch plaintiff's car and that it did not appear to slow down or decrease its speed until it was between 60 to 75 feet of the crossing.

He further testified as follows:

"Q Now, Mr. Horstmeyer, when you saw Mr. Campbell's car the second time, if his car continued at the same rate of speed that it was going and the train continued at the same rate of speed that it was going, were the two going to collide at the intersection of the track at the highway?

"A If it continued at that speed, yes, sir, but there was still time for the driver of the automobile to stop to avoid a collision whereby at two hundred feet had I shouted a warning to the engineer to big hold the train, it takes approximately four seconds for the brakes to apply in emergency on the entire train, therefore, we would have traveled two hundred feet. * * *

"Q So, in effect, when you saw this automobile the second time nothing was done on that train as far as trying to apply the brakes or anything? A No, sir.

"Q You just kept going?

"A I didn't consider it an emergency.

"Q I see. Now, when you first saw the automobile just before you even get to the fertilizer plant if the automobile had continued at its rate of speed and if the train had continued at its rate of speed would the two have collided then at the intersection?

"A Had he not applied his brakes? * * *"

The case was submitted on Instruction 1 requiring findings that "plaintiff became and was in a position of imminent peril of being struck and injured by said train, and that the defendants saw or, in the exercise of ordinary care, could have seen plaintiff in the aforesaid position of imminent peril, if you so find, in time thereafter for the defendants, by the exercise of ordinary care, with the means and appliances then and there at hand, and with reasonable safety to said train, its occupants, and all persons thereon to have slackened the speed of said train, or to have given a timely and adequate warning of the approach and proximity of said train, and that by so doing, defendants could thus and thereby have avoided colliding with plaintiff's automobile."

■ Plaintiff alleges error in giving Instruction 2, the first paragraph of which was as follows: "The Court instructs the jury that the engineer or fireman in charge of a motor running a train upon seeing an automobile approaching a crossing while such automobile is still in a place of safety and at such distance from the crossing as to yet allow the driver a reasonable time to stop before going upon the crossing in front of such train, is entitled to assume that the driver of such automobile will stop before going upon a crossing and into danger of being struck by such train; and the court further instructs you that neither the engineer nor fireman on the train is under any duty to blow the whistle or attempt to slacken the speed of the train until he sees, or in the exercise of ordinary care should see, that such automobile is not going to stop and is in a position of danger." No criticism is made of the second paragraph which was a converse of plaintiff's humanitarian submission. Plaintiff's objection to this instruction is that it unduly limited the zone of imminent peril to be considered by the jury, which was widened beyond the distance in which plaintiff could stop be-

fore reaching the crossing by plaintiff's obliviousness. He says obliviousness was shown by both his and defendants' evidence. It seems evident there was actual obliviousness until too late for plaintiff to stop and we find there was substantial evidence from which the jury could find there were reasonable appearances of obliviousness. As hereinafter stated, we consider, under the evidence in this case, it was error to tell the jury the trainmen were entitled to assume plaintiff was not oblivious to the approach of the train, which is what this instruction really meant.

Defendant points out this instruction is the same as the one given (No. 4) in Janssens v. Thompson, 360 Mo. 351, 228 S.W.2d 743, 746, and much like the one in Poague v. Kurn, 346 Mo. 153, 140 S.W.2d 13, 16(D) except for its reference to "due care". The above quoted part is also like Instruction A offered in Clark v. Atchison, T. & S. F. Ry. Co., 319 Mo. 865, 6 S.W.2d 954, (concerning a pedestrian) in which we reversed a judgment for plaintiff because the court refused defendant's request to give it. However, in the Janssens case, we said (228 S.W.2d l. c. 746) we had stated in the Poague case: "[T]hat what this instruction really meant, and that what the trainmen were entitled to assume, was that the approaching driver was not oblivious to the approach of the train unless he showed some reasonable appearance of obliviousness; and that it would make the issues clearer to state it that way. Here defendant's evidence was that Janssens' actions (continuing to slow down until he got within about 20 feet of the track) indicated that he was not oblivious. Therefore, there was evidence on which to base such an instruction." Likewise in the Clark case, there was evidence on which to base such an instruction. As pointed out therein (6 S.W. 2d l. c. 961): "In this case the fireman testified that when he first saw Clark that the latter was standing near the track, not in the zone of danger, looking directly at the approaching engine and train. If that was true, the fireman, until he saw some indi-

cation to the contrary, had the right to assume that Clark would remain in a place of safety until the train had passed." In the Poague case, the instruction was broader and more favorable to the plaintiff therein because "it informed the jury that the fireman's duty begins when 'he sees, or in the exercise of ordinary care should see, that such automobile was not going to stop and *was going to enter* into a position of danger,'" (140 S.W.2d l. c. 17) and another instruction (140 S.W.2d l. c. 19) further expanded "improperly the defendant's duty" so as to give the plaintiff "a more favorable submission than he was entitled to have." Nevertheless, we had stated that in Branson v. Abernathy Furniture Co., 344 Mo. 1171, 130 S.W.2d 562, 571, concerning a similar instruction: "[W]e think that it would be better for such an instruction to state only when the defendant's duty commenced, instead of prefacing such a statement with what the defendant 'had a right to assume.' While we do not consider this prejudicial per se, if the trial court had granted a new trial on the ground that it was an overemphasis of the matter, we would be inclined (as in case of a new trial granted because of overemphasis of the burden of proof) to defer to its judgment."

Thus this part of the instruction has been criticised several times but not held prejudicially erroneous because of special circumstances in those cases. However, the main trouble with this instruction in this case is the lack of evidence on which to base it such as was present in the Janssens case and the Clark case. The evidence in those cases prevented it from being prejudicially erroneous because reasonable appearances indicated no obliviousness. In Triller v. Hellwege, Mo.Sup., 374 S.W.2d 104, 108, we found reversible error in giving an instruction which restricted the zone of peril to the time a small girl left the shoulder of the highway toward which she ran from a store. We said: "In thus narrowing and limiting the zone of peril the available distance within which defendant would have to stop to avoid a collision was so greatly

shortened that it would have been a manifest impossibility for him to have stopped, and therefore the giving of Instruction No. 4 was tantamount to the direction of a verdict for defendant." Likewise, here, limiting defendants' duty to "such distance from the crossing as yet to allow the driver a reasonable time to stop" restricts the jury to a narrower zone of peril than the jury was authorized to consider on a showing of obliviousness and reasonable appearances thereof.

This is a true last clear chance case, under the evidence most favorable to plaintiff. See Wabash Railroad Co. v. Dannen Mills, 365 Mo. 827, 288 S.W.2d 926, 928. See also Restatement of Torts, Second, Sec. 480. Comment b under this section is entitled "When defendant can assume plaintiff will avoid danger." It is there stated: "It is not enough that the defendant sees the plaintiff in a position which would be dangerous were the plaintiff not aware of what is going on. It is also necessary that the defendant realize or should realize that the plaintiff is inattentive and, therefore, is in peril. The defendant is entitled to assume that the plaintiff is paying or will pay reasonable attention to his surroundings; until he has reason to suspect the contrary, he has no reason to believe that the plaintiff is in any danger. Therefore, the defendant is liable only if he realizes or should realize that the plaintiff is inattentive and consequently in peril. * * * However, it is not necessary that the circumstances be such as to convince the defendant that the plaintiff is inattentive and, therefore, in danger. It is enough that the circumstances are such as to indicate a reasonable chance that this is the case. Even such a chance that the plaintiff will not discover his peril is enough to require the defendant to make a reasonable effort to avoid injuring him. Therefore, if there is anything in the demeanor or conduct of the plaintiff which to a reasonable man in the defendant's position would indicate that the plaintiff is inattentive and, therefore, will or may not discover the approach of the train, the engineer must take such steps as a reasonable man would think necessary under the circumstances."

Instruction 2 authorized an absolute assumption as long as plaintiff's car had reasonable time and distance to stop short of the crossing without regard to appearances of obliviousness, when there was evidence from both plaintiff and defendants from which the jury could find obliviousness and reasonable appearances of obliviousness beyond such distance. This was defendants' theory as shown by the following statement of defendants' counsel at the trial: "[T]he law of this state is that a train operator has a right to presume that a vehicle approaching a crossing will come to a stop; and he is not required to act until such time as the vehicle is in a position of peril of being struck; and at a distance of four hundred feet according to the plaintiff's testimony in this case there is no peril and the operator of this train is not required to take any action at that time. The plaintiff's testimony in this case shows that he could have stopped his automobile at any time at the speed he was traveling, at one hundred seventy-five feet. [T]herefore, the peril in this case doesn't arise until this vehicle is within one hundred seventy-five feet of the tracks, and it is not until that position of peril arises that this operator is required to take any emergency action to prevent his engine having a collision." In this case, there was no evidence definitely indicating lack of obliviousness as in the Janssens and Clark cases in which we held it was proper to give this part of the instruction because of such evidence. In the Dannen Mills case (288 S.W.2d l. c. 930) we quoted with approval from a previous case, as follows: "'"If he [the driver] is apparently dominated by a fixed intent to pursue his course into the [train's] very path, he is no less in peril at any given time and place after such fixed intent becomes apparent than would be the case if he was aware of his predicament, but was physically unable to extricate himself."'" Considering Horst-

**904**

meyer's testimony as to his observation of the approach of plaintiff's car and the appearances of the situation as shown by his testimony, and Robb's testimony that an application of the brakes at 400 feet from the crossing, there would have been an appreciable slackening of speed before reaching the crossing, (plaintiff said he could have escaped (by turning on the service road) if he could have had another 15 feet) we must hold it was error to give Instruction 2. Horstmeyer said he did nothing at that point because he "didn't consider it an emergency." Our view is that the jury reasonably could have found otherwise but that this instruction gave them a direction to the contrary.

■ Since this case may be retried, we consider plaintiff's claim of error in permitting counsel for defendants to read portions of the deposition of Robb, after plaintiff's counsel had read from the depositions of Horstmeyer and Robb as admissions against interest. Plaintiff says the parts read on his part "concerned the application of brakes, the slackening of the speed, the facts showing plaintiff's obliviousness and whether the same were apparent to defendants, and the distances and speeds of the automobile and train"; but that "all that defendant Robb's counsel read had to do with the sounding of the whistle." Plaintiff says he "had read nothing concerning the sounding of the whistle from the depositions of Horstmeyer and Robb." Our view is that sounding the whistle had an important bearing on the issue of plaintiff's obliviousness and the reasonable appearances of obliviousness and tended to explain the testimony concerning Horstmeyer's conduct, which plaintiff had read. Therefore it was properly admitted under the rule stated in Binion v. Armentrout, Mo.Sup., 333 S.W.2d 87, 92. Other matters raised in plaintiff's brief may be considered by the parties if the case is re-

tried and are not likely to occur in the same way on retrial.

The judgment is reversed and the cause remanded.

All concur.